No. 28,167.

George W. Hall et al., *Appellees*, v. Thomas M. Galey et al., *Appellants*.

(271 Pac. 319.)

Opinion filed
November 3, 1928.

*J. L. Stryker, William Davis,* both of Fredonia, *Thomas E. Wagstaff, Jay W. Scovel, John Bertenshaw* and *Kirke C. Veeder,* all of Independence, for the appellants.

*John J. Jones,* of Chanute, and *E. D. Mikesell,* of Fredonia, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: Plaintiffs brought this action for damages for ruining a well which furnished the principal supply of water for their farm.

It appears that for some years past plaintiffs have owned a farm of 280 acres in Wilson county. The farm is well improved with farm buildings conveniently located near the well. The usual activities of agriculture, dairying, gardening and poultry raising have hitherto been successfully conducted on the farm. Until its destruction this well contained a never-failing supply of good water, suitable and used for plaintiffs' household and live stock and to irrigate their garden.

In March, 1924, on an adjacent tract of land, 463 feet distant from plaintiffs' well, defendants drilled a gas well several hundred feet deep, which contained a considerable vein of salt water. According to the allegations of plaintiffs' petition defendants neglected to encase their gas well, or plug it when it was abandoned, with the result that the salt water rose to the level of the ground and gradually impregnated the soil thereabout, and eventually polluted the water in plaintiffs' well to such an extent as to render it permanently unfit for use.

Defendants joined issue by a general denial, and the cause was tried before a jury. The jurors were taken to view the premises, so that they had first-hand information of the location and surroundings of plaintiffs' well and the location and situation of defendants' gas well with reference thereto, and the evidence for plaintiffs tended to support the allegations of their petition. Defendants showed that on plaintiffs' farm at not much greater distances were several other extinct gas wells which likewise contained salt water, any one of which, defendants contended, might have caused the pollution of the water well. These other gas wells were referred to

by names and numbers, the nearest being located 665 feet north-west of plaintiffs' water well and known as Hall No. 4. At still greater distances were others numbered 1, 2, 3 and 5. Defendants' gas well, to which the damage to plaintiffs' well was ascribed, located 463 feet south and slightly east of plaintiffs' water well, is designated in the record as Neal No. 1.

The jury returned a general verdict of $2,500 in favor of plaintiffs and answered special questions, viz.:

"Q. 1. Did you find from the evidence that the plaintiffs used and operated the well known as Hall No. 4 and referred to in the evidence as the Sharpless well, as a gas well before defendant drilled the well in question on the Neal lease and referred to in the evidence as Neal No. 1? A. Yes.

"Q. 2. Do you find from the evidence that during the operation of well designated as Hall No. 4, by the plaintiffs as a gas well that salt water flowed over the top of said well and onto the surface of the land adjacent thereto? A. Yes. . . .

"Q. 4. Before the defendants drilled the well on the Neal lease designated and referred to as Neal No. 1, were there three old abandoned wells on said lease, drilled to the Bartlesville sand at an approximate depth of 900 feet? A. Yes.

"Q. 5. Did the wells designated and referred to as Hall No. 1, Hall No. 2, Hall No. 4 and Hall No. 5 contain salt water? A. Yes.

"Q. 6. In the event your verdict is for the plaintiff, then state how and in what manner the water in the Neal well polluted with salt the water well of plaintiffs. A. By leakage of salt water from Neal well into the fresh water strata of the Hall water well.

"Q. 7. If you find that the damage complained of by plaintiff is permanent, then state upon what fact or condition you base said finding. A. By the presence of salt water, it is presumed to continue indefinitely."

Judgment was entered for plaintiffs and defendants assign certain errors, the first of which raises the point that no causal connection between the pollution of the well and defendants' gas well was shown. It would seem that the cause of the pollution of the well was shown about as convincingly as could be expected in the nature of the case. Prior to the drilling of defendants' gas well the water in plaintiffs' well was wholesome. There was a vein of salt water in defendants' gas well which rose to the surface and saline deposits began to appear on the ground thereabout, the nearby vegetation died, and within a few months the water in plaintiffs' well became impregnated with salt, and eventually it became too salty for either domestic use or to water the live stock or irrigate the garden. It was also shown that defendants had neglected to

comply with the statutes designed to prevent the sort of mischief which happened in this case. These statutes, in part, read:

"If any well or other excavation be put down to or through any vein or strata containing salt water or water containing any minerals in appreciable quantities, it shall be the duty of the owner or operator, driller or person putting down such well or excavation to case or plug such well or excavation in such manner as to exclude all salt water or water containing minerals in appreciable quantities from both upper and lower veins or strata holding water suitable for domestic purposes." (R. S. 55-118.)

"It shall be unlawful for any person, having possession or control of any well drilled, or being drilled for oil or gas, either as contractor, owner, lessee, agent or manager, or in any other capacity, to permit salt water, oil or refuse from any such well, to escape upon the ground and flow away from the immediate vicinity of such well, and it shall be the duty of any such person to keep such salt water, oil or refuse safely confined in tanks, pipe lines or ponds, so as to prevent the escape thereof. . . ." (R. S. 55-121.)

It was also shown that the other abandoned gas wells which were suggested as possible sources of the pollution of plaintiffs' well were at distances of 665 feet, 900 feet, 1,120 feet, and 1,200 feet respectively, and that they had been plugged to prevent the flow of their noxious contents. (R. S. 55-116; 55-123 *et seq.; Maxwell v. Coffeyville Mining & Gas Co.*, 68 Kan. 821, 75 Pac. 1047.) The gas well known as Hall No. 4 concerning which several special questions were submitted to the jury was located at a distance of 665 feet from the water well—202 feet further than defendants' well—had been cased when it was drilled, and when it was abandoned and the casing removed it was plugged according to directions of the "county plugger." The fact that salt water stood in these "plugged" wells would not go far to show a possibility that they caused the pollution of the water well. Being plugged, the flow of salt water would be checked in these wells far beneath the level of the water well.

Defendants emphasize the want of evidence regarding the geological formation, the nature, trend and direction of the subsurface strata, which would have established with scientific precision the source of the salt water which ruined the well. However, our concern is whether the evidence which plaintiffs did adduce was sufficient to take the case to the jury, and to this it seems imperative to return an affirmative answer. (*Gilmore v. Salt Co.*, 84 Kan. 729, 115 Pac. 541; *Helms v. Oil Co.*, 102 Kan. 164, 169 Pac. 208.)

It is also contended that no permanent damage to plaintiffs'

farm was shown. The well was the principal source of water supply for the farm. The farm buildings were located within convenient access thereto. The water supply had been abundant and of wholesome quality, and served the needs of plaintiffs, their live stock and garden; and in times of severe drought, when other wells in that locality gave out, it never failed. The pollution of the well had continued for over three years without change for the better. The defendants' gas well which caused this mischief, 1,000 feet deep, 4 to 8 inches in diameter, has stood full of salt water and uncased and unplugged, so that there was nothing to prevent the permanent flow of salt water rising therein from continuing its noxious influence on the fresh water stratum which is the source of supply for plaintiffs' well. As defendants' well was not on land controlled by plaintiff he had no right of entry to attempt by artificial means to shut off the continuing rise and flow and seepage of salt water. These facts, together with the jury's view of the premises, tended to establish a case of permanent damage, and there was little or no evidence tending to show that the damage was impermanent or abatable by any practical means available to plaintiffs. The question of permanency of the injury was properly left to the jury.

The jury's response to special question No. 7 is subjected to the criticism that the permanent character of the damage was based solely on the presumption that it would continue indefinitely. We are not prepared to say that, even if so, this finding would not stand. It is a presumption of science and of logic that any status once shown to exist will continue until altered by some external force. Doubtless the finding was induced by the evidence and by the court's pertinent instruction which read:

"You are instructed that a permanent injury to realty as distinguished from a temporary or continuing one, is one of such a character and existing under such circumstances as will be presumed to continue indefinitely."

Error is assigned on the trial court's instructions touching the proper measure of damages. The court ruled that if the jury found that the injury to plaintiffs' farm caused by the destruction of the well was permanent, the measure of damage would be the difference between the fair market value of the farm before and after the well was destroyed. This was a correct statement of pertinent law. (C. B. U. P. Rld. Co. v. Twine, 23 Kan. 585; Comm'rs of Smith Co. v. Labore, 37 Kan. 480, 15 Pac. 577; C. K. & W. Rld. Co. v. Willits,

45 Kan. 110, 25 Pac. 570; *Railway Co. v. Weidenmann*, 77 Kan. 300, 94 Pac. 146.) While other measures of ascertaining permanent damage to real property have been approved by this court, as in *Railway Co. v. Lycan*, 57 Kan. 635, 47 Pac. 526, and in *Barker v. Railway Co.*, 94 Kan. 61, 145 Pac. 829, it is not suggested how plaintiffs' permanent damage could have been shown more accurately than by the evidence of value of the farm prior and subsequent to the destruction of its principal water supply.

Error is also assigned on the trial court's refusal to give an instruction on the plaintiffs' duty to mitigate their damage, which defendants suggest could have been done by developing greater use of a spring on the farm, or by digging a new well. The, doctrine of an injured party's duty to mitigate his damages is inapplicable to plaintiffs' situation. Whatever plaintiffs could do to lessen the damage to their well because of the wrongdoing of defendants was, of course, their duty to do. But to dig a new well—assuming a new well convenient to their farm buildings would not be subject to the same contamination as the old well—would not be a minimizing of the damage or total destruction of the old well; neither would the development of the spring, if indeed it had a never failing and abundant supply of wholesome water—a fact which was not established. Those and other possible sources of a new and adequate supply of water may exist, but they take nothing from defendants' liability for their wrongdoing in the case presented by this appeal.

The judgment is affirmed.