No. 31,727

Elzada Berry, *Appellee*, v. The Shell Petroleum Company et al. (The Continental Oil Company; The Phillips Petroleum Company; and The Mary Jane Oil Company), *Appellants*.

(33 P. 2d 953.)

Opinion filed July 7, 1934.

*Chester I. Long, Claude I. Depew, W. E. Stanley* and *William C. Hook,* all of Wichita, for the appellants; *William H. Zwick, A. L. Hull,* of Ponca City, Okla., and *Redmond S. Cole,* of Tulsa, Okla., of counsel.

*Joe T. Rogers* and *James A. Conly,* both of Wichita, for the appellee.

The opinion of the court was delivered by

Smith, J.: This was an action for damages to real estate caused by the seepage of salt water, thereby ruining the water supply on the real estate. Judgment was for plaintiff. Defendants appeal.

Many of the facts were agreed to. Briefly they are as follows: In August, 1928, an oil and gas well was drilled near the town of Valley Center, approximately eight miles north of the city of Wichita. This well and later developments made in the field were located near and on the banks of the Little Arkansas river. As soon as the discovery well was found to be a producer an intensive drilling campaign started in the Valley Center oil field. A short time after the wells had been drilled they began producing salt water,

as well as oil from the same wells. This condition caused various companies to place at each well what is known as settling tanks. The oil and salt water coming from the well was pumped into the tank. The tank had two outlets, one located above the other. The fluid coming from the well was kept at such a level that the oil passed out at the upper opening and the salt water at the lower opening. At each location, or at each well, the companies constructed a concrete pit, into which the salt water from the settling tank was emptied. Oil was discovered at Valley Center, a few miles north of the city of Wichita, in August, 1928. The Little Arkansas river runs through the center of this field and flows south through the city of Wichita to a junction with the Big Arkansas river, near the center of the city. Near this junction the water supply of the city is obtained. Before reaching this junction the river flows through approximately two hundred acres of city-park property. About three-quarters of a mile east of the Little Arkansas river, at Twenty-first street, is located the heavy industrial district, with packing houses, refineries, railroad shops, stockyards, etc. Running in a southeasterly direction from this industrial district is an open sewer of the city, known as the Wichita drainage canal, originally constructed about 1908 and widened in 1925. This drainage canal empties into the Big Arkansas river south of the city limits of Wichita. Just above Eighteenth street this open drainage canal divides, the center branch running north, a branch running northeast to the city limits, referred to as the east branch, and a branch extending to the northwest, referred to as the west branch. This west branch passes by the packing houses, crossing Lawrence street at about Twenty-fourth street and continuing northwest to the city limits at about Twenty-seventh street. This drainage canal is sometimes referred to as Chisholm creek. About 1920 an inclosed concrete sewer was constructed through the city of Wichita, commencing at approximately Twenty-fourth street and Lawrence avenue and having its outlet in the Big Arkansas river south of the city limits. This was known as the Wichita sanitary sewer, its only outlet being in the big river south of the city.

Soon after the discovery well was drilled a representative of the city commission advised the oil companies in the field that salt water might be produced, and that if it was the city-water supply would be endangered and the park system damaged. The oil com-

panies were advised that action would be taken by the city unless satisfactory arrangements were made to take care of the salt water.

The result of this correspondence and these conferences was that the city demanded that the oil companies bring their salt water to the city of Wichita and turn it into the sewer system of the city of Wichita for conveyance through the city to the big river south of the city. As evidence of this agreement the city passed an ordinance giving the Gypsy Oil Company a revocable permit to construct a pipe line to a designated point in the city, and granting to the company the right to connect this pipe line with the sewer system, and to empty salt water into the sewer. This right was granted by the city upon condition that the pipe should be attached to the sewer in a workmanlike manner, and that "said grantee shall at all times have a properly connected line into Chisholm creek with suitable valves for an emergency discharge into said creek, and shall operate said emergency discharge in accordance with the instructions of the city." The city reserved the right to revoke the permit and to pass and enforce any reasonable regulations necessary to control of the pipe. The Continental Oil Company succeeded the Gypsy Oil Company.

Following the passage of the ordinance and acceptance by the oil companies a pipe line was constructed from the Valley Center oil field and connected with the Wichita sanitary sewer at Twenty-third and Lawrence streets. This sewer is an inclosed, concrete sewer running completely through the city. Pursuant to the ordinance an emergency outlet was also constructed at approximately Twenty-fourth street and Lawrence and connected with the Wichita drainage canal. This emergency outlet was so arranged that the salt water could be turned into the west branch of the drainage canal at the option of the city. The operation of each of these outlets was at all times under the control of the city of Wichita. The city of Wichita kept the keys to the gates and regulated the flow of salt water either into the city sewer or through the emergency outlet at its own convenience and in the manner in which the city deemed advisable.

At the beginning of December, 1930, the emergency outlet of the salt-water line from Valley Center was extended from its original location at approximately Twenty-first street, and the Wichita sanitary sewer to a location at Twenty-first, and the east branch of the Wichita sewer system, known as the Wichita drainage canal, at which point the emergency outlet remained until in the month of

April, 1931, when at the instance and request and upon the demand of the city of Wichita at that time the emergency outlet was carried farther south and discharged at a point in the east branch of the sewer system, known as the Wichita drainage canal, at approximately Nineteenth street, where it remained until some time in April, 1933. The emergency outlets were constructed in each instance at the request of the city and at locations designated by the city.

The arrangement entered into with the city of Wichita in the first instance was that the city of Wichita would carry this salt water through its sanitary sewer system except when the city deemed it advisable to turn the salt water into the open drainage canal for flushing purposes. It was the understanding that they were carrying this water through the sanitary sewer system except in a case of emergency, or except when they found it necessary to divert it into the drainage canal for the purpose of further flushing the drainage canal.

The water was emptied into the canal from July 15, 1929, until August 15, 1929; from September 15, 1929, to February 15, 1931; from March 15, 1931, to March 20, 1931; and from April 26, 1931, until April 7, 1933.

The oil companies pumped through their salt-water line about 24,000,000 barrels of salt water. In 1930 they pumped 5,500,000; in 1931, 7,000,000 barrels; in 1932, 6,000,000. Nearly all that was pumped in 1931 and 1932 was put into the drainage canal.

The property owned by the plaintiff, and which she claims was damaged, is located immediately south of Twenty-first street and about 250 feet south and west of the point where the salt water was discharged into the drainage canal.

The terrain here is level. About four feet of black soil forms the surface structure, eight or ten feet of clay lies under that, and under the clay is sand. About twelve or fourteen feet under the surface of the ground is pure sand. At a depth of about twenty-one or twenty-two feet water is encountered. At a depth of about forty-eight feet shale is found. The Wichita drainage canal is bottomed in sand and is between sixteen and twenty feet deep. City water is not available in this section and the people depend upon wells for their water supply.

The petition alleged the general situation about as we have given it here. The petition then alleged that by means of the pipe line

spoken of the oil companies emptied their salt water into the drainage canal and that by reason of the nature of the soil the salt water percolated into and under plaintiff's property. The petition alleged the location of the well, and that before the happening of the events pleaded the water in the well was pure and wholesome, and that, by reason of the salt water being so discharged, the water allowed to pass into the canal had percolated into the ground and into the water supply in which her well is located, and has poisoned and ruined her water to such an extent that it is unfit for any use whatever, "and that by reason of the acts of the defendants in so conducting said water from the town of Greenwich to the point above described and there discharging the same into said ditch, together with the acts of the other defendants as hereinafter set out, have caused this plaintiff great damage; that said injury is permanent."

The petition did not make any allegations of negligence. The defendants answered with a general denial and an allegation pleading the statute of limitations. The answer further set out the facts with reference to the location of the sewers and the land of plaintiff; that the drainage canal is a part of the sewer system of the city, and was at all times under the control of the city; that many industrial firms had been depositing their sewage in the canal for years, and that if plaintiff had suffered the damage claimed it was not caused by defendant, but was caused by pollution escaping from the canal in the course of its operation by the city, and this pollution had been deposited there by these firms independently of each other and of defendant. The answer further alleged the facts about as they have been detailed here with reference to the oil field, the park system of the city, the passage of the ordinance, the laying of the pipe line and the changing of the locations of the outlets. The answer alleged that there never was a break in the pipe line maintained by the defendant, and that no salt water escaped from the pipe except into the canal in the manner and at the place where the city directed defendant to place it. The answer further alleged "that if any damage has resulted from said salt water in the form and manner as alleged in plaintiff's petition, which this defendant denies, that the same did not result from any lack or want of care on the part of this defendant in the operation of said pipe line, nor did it result from any acts of this defendant in disposing of said salt water for its own convenience, but only resulted after the same had passed beyond the control of the defendant and after the same,

under the orders of the city of Wichita, had been turned into the public sewer of said city known as the Wichita drainage canal, located upon the property and land belonging to said city, and if any damage resulted from said salt water, which this defendant denies, the same resulted from the improper construction, operation or maintenance of said sewer by the city of Wichita, or by and through the failure of the city to properly handle said salt water through its sewer system after the defendant had been directed to place the same therein by said city."

The answer further alleged that if the damage occurred it had occurred as a result of the operations of the canal long prior to the time when defendant made any use of it.

The answer further alleged that plaintiff knew, or should have known, of the manner in which the canal was being operated and that it might, in dry times, cause a pollution of the substrata, but that plaintiff made no objection to the use to which the canal was being put, and by such failure is estopped to claim that damage, if any, has resulted.

Trial was before the jury. A verdict for plaintiff in the amount of $500 was returned. This was reduced, on motion, to $300, and judgment rendered accordingly. It is from this judgment that defendant appeals.

Many errors are urged by defendants. The one most seriously argued is that the court erred in failing to sustain a demurrer to the evidence of plaintiff and in failing to instruct the jury to return a verdict for defendant.

It will be noted that there is very little dispute in this case except as concerns the water entering the canal. The theory of defendants is that when they connected their pipe line with the sewer system of the city that all duty with reference to the salt water ceased, or, stated in another way, the proximate cause of the damage to the property of plaintiff was not any act of defendants, but was an act of the city in turning the salt water into the canal instead of into the inclosed sewer. An answer to one proposition will answer the other.

The rule is well settled that an individual who sustains an injury peculiar to himself may have relief against a public nuisance and is entitled to maintain an action at law for damages on account of the special injury which he has sustained. (46 C. J. 730; *Marts v. Freeman*, 91 Kan. 106, 136 Pac. 943, and cases cited.) There is no

question but that in this case the petition alleged and proved special damages, different from that suffered by the general public, sufficient to entitle plaintiff to bring this action under the above well-recognized rule.

It is well settled in this state that where a water supply is damaged by salt water percolating through the soil and impregnating it with salt so that the water is rendered unfit for use, the owner of the land may maintain an action for damages against the owner of the land from whose land the salt water escaped. (*Gilmore v. Salt Co.*, 84 Kan. 729, 115 Pac. 541; *Hall v. Galey*, 126 Kan. 699, 271 Pac. 319.)

No less well established than these two rules is the one that—

"The person whose grass or corn is eaten down by the escaping cattle of his neighbour, or whose mine is flooded by the water from his neighbour's reservoir, or whose cellar is invaded by the filth of his neighbour's privy, or whose habitation is made unhealthy by the fumes and noisome vapours of his neighbour's alkali works, is damnified without any fault of his own; and it seems but reasonable and just that the neighbour, who has brought something on his own property which was not naturally there, harmless to others so long as it is confined to his own property, but which he knows to be mischievous if it gets on his neighbour's, should be obliged to make good the damage which ensues if he does not succeed in confining it to his own property."

The above language is from the case of *Fletcher v. Rylands*, L. R. 1 Exch. 263. The quotation is contained in *Helms v. Oil Co.*, 102 Kan. 164, 169 Pac. 208. The court in that case held:

"If the owner of a refinery permits oil, refuse and poisonous substances in large quantities to escape from the refinery and flow over and upon the land of his neighbor, causing material injury to the neighbor, the use of the refinery will be deemed to be unreasonable and to constitute a nuisance.

"The fact that the business of the refinery is in itself a lawful one, and that the owner of it operates it carefully, will not exempt him from liability for casting oil, refuse and poisonous substances on the land of the plaintiff in such quantities as to cause him substantial injury." (Syl. ¶¶ 1, 2.)

To the same effect is *Fogarty v. Pressed Brick Co.*, 50 Kan. 478, 31 Pac. 1052; *Stotler v. Rochelle*, 83 Kan. 86, 109 Pac. 788; and *Gilmore v. Salt Co.*, supra.

There is ample proof in this case that the oil companies soon after the development of the field found themselves overburdened with salt water. This salt water had been harmless as long as it was left in the ground, but once it was raised to the surface of the earth it became a harmful agent. Salt water ruins drinking water and de-

stroys vegetation. The problem of what to do with it has long been a perplexing one here in the Midcontinent field. Be that as it may, the company has brought something on its own property which was not naturally there, harmless to others so long as it is confined to its own property, but which it knows to be mischievous if it gets on its neighbors. There is a statute in this state which deals with this subject. It is R. S. 55-121 and is as follows:

"It shall be unlawful for any person, having possession or control of any well drilled, or being drilled, for oil or gas, either as contractor, owner, lessee, agent or manager, or in any other capacity, to permit salt water, oil or refuse from any such well, to escape upon the ground and flow away from the immediate vicinity of such well, and it shall be the duty of any such person to keep such salt water, oil or refuse safely confined in tanks, pipe lines or ponds, so as to prevent the escape thereof: *Provided, however,* That this act shall not be construed to apply to the escape of salt water, oil or refuse because of circumstances beyond the control of the person in the possession or control of such well and under circumstances which could not have been reasonably anticipated and guarded against."

The statute has been held constitutional in *State v. Lebow,* 128 Kan. 715, 280 Pac. 773. It will be seen that this statute directs the companies to keep their salt water in the vicinity of the well. Such a statute was not needed, however, to make the oil companies liable for damages caused by the escape of salt water from the premises of the company. This has been the law ever since the case of *Fletcher v. Rylands,* supra. The statute only made it possible that the companies could be compelled to keep the salt water confined without waiting for any person to be damaged.

It must be remembered that negligence is not a necessary element of the right of recovery in a case like this. The right to recover results from the company having the harmful substance on its land and permitting it to escape to the damage of plaintiff.

The arrangement between the city and the oil companies was not that of one who contracts to perform a certain duty. The city owed no duty to the oil company nor did the oil company owe any duty to the city except to keep its salt water confined on its own property. An examination of the ordinance will disclose that the city did not agree to do anything whatever with the salt water of the companies. The most that can be said is that the city gave the oil companies the use of sewer facilities for the purpose of carrying off the salt water. The relationship between the oil companies and the city is not that of employer and employee, nor is the city's position

that of a contractor who has agreed to perform a certain work. The oil companies started the chain of circumstances that caused the damage to plaintiff when they laid the pipe line to the sewer system of the city. When the salt water once left the vicinity of the oil wells the companies became liable for whatever damage should flow from its escape. The fact that the companies put it in the power of the city to so direct the flow of the salt water that damage resulted does not excuse them. Even if the liability sprang from negligence, which it does not, the rule would probably not be different. See Harper on Torts, § 115 *et seq.* The liability, however, springs from the fact that the companies had salt water on their property and permitted it to escape. We are aware of the fact that such a ruling places a great burden on the oil industry. It is, however, no new principle which we are announcing. It is as old as the industry of man. We consider that the water supply of the people is of greater importance than the operation of a business at a reduced cost. In a vigorous brief counsel for defendants state:

"The first question in the case is, what did these defendants do? Did their acts create a nuisance? Did the acts of these defendants violate any rule of law which protects the plaintiff?"

The answer to the first question is, they permitted their salt water to escape. The answer to the second question is "yes." See *Fletcher v. Rylands,* supra, and allied cases. The answer to the third question is "Yes, they permitted the salt water produced on their land to escape therefrom." This violated their common-law duty, as well as the statute. Counsel argues that the action of the oil companies was taken pursuant to a demand of the city. The companies argue that it was the city's plan. The city had no power to force any plan upon the oil companies. There was no duty on the oil companies to bring their salt water to the city sewer system. The only duty the oil companies owed anyone was to keep the salt water on their own premises, or, if it escaped, to so dispose of it as not to cause damage to any person. Defendants cite many cases holding that where there is an intervening cause to which the damage can be traced the person responsible for the remote cause will not be held liable. The cases are not in point here because they all deal with negligence. In this case negligence is not an element.

Defendants argue that the court erred in failing to permit counsel for defendants to argue to the jury the question of proximate cause and that the acts of the city, not defendants, were the cause of the

damage. This argument was based on the idea that has just been dealt with in this opinion and does not merit further consideration. Defendants asked that the following instruction be given:

"You are instructed that before plaintiff can recover in this case he must prove by a preponderance of the evidence that the acts of the defendants, or one or more of them, in transporting the salt water from Valley Center and delivering the same to the Wichita sewer system was the proximate cause of the injury, if any, sustained by plaintiff."

This instruction was refused, and, to cover the point, the court gave the following two instructions:

"Before plaintiff can recover she must prove by a preponderance of the evidence that the acts of the defendants, or one or more of them, in transporting and discharging the salt water alleged in the pleadings and described and designated in the testimony, was the proximate cause of the damage alleged by plaintiff.

"Proximate cause of injury is that cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury complained of, and that without such proximate cause the result, to wit, the pollution of plaintiff's well and the water under her premises, would not have occurred."

The defendant also requested the following instruction:

"You are instructed that if you find from the evidence in this case the city of Wichita, in order to protect the public health and public property of said city, entered into the agreement with the Gypsy Oil Company, its successors and assigns, as shown by ordinance 10-196 of said city, then and in that event it became the duty of the city of Wichita to so maintain and regulate its sewer and drainage system so that no nuisance would be caused by the transportation of salt water and other oil-field refuse by either of said systems; and if you further find that plaintiff was injured by a failure of the city of Wichita to perform its duty in this regard, your verdict must be for the defendants and each of them.

"You are instructed that in a case of this character, involving damage to the plaintiff's property from the pollution of the underground waters thereunder by reason of salt water seeping or percolating into the same from the Wichita drainage canal, the plaintiff must establish by a preponderance of the evidence that the salt water seeping from said drainage canal not only caused or contributed to the damage in question, if any, but that the salt water passing into the drainage canal in question was the proximate result of the act or acts of one or all of the defendants herein named. So, therefore, if you find from the evidence submitted in this case that pursuant to the terms of ordinance 10-196 of the city of Wichita that the act or acts of the defendants, or any of them, was limited merely to connecting their salt-water line with an inclosed tile sewer, which would carry the salt water through and under the city of Wichita, and in providing an emergency outlet only into the drainage canal at the place or places designated by the officials of the city of Wichita, and that

thereafter any salt water finding its way into the drainage canal was due to the act or acts of the officials, agents, servants or employees of the city of Wichita in so regulating the valves that the said salt water would be so diverted from the sanitary sewer into the drainage canal, and that the defendant or defendants at no time had any control over or did not manipulate in any way said valves causing such diversion of salt water, then your verdict shall be for the defendants and against the plaintiff."

Instead, the court gave the following instruction:

"It was the duty of the defendant companies to dispose of the salt water without injuring any other parties. If in disposing of said salt water the defendants saw fit to bring it to the city and use the facilities of the city for carrying the said salt water on farther south, the mere fact that the defendants had a contract with the city for said services does not in the least enter into the merits of this action as between the plaintiff and said defendants for the alleged injury arising from pollution of plaintiff's well by said salt water, if you find that to be a fact."

Defendants argue that the failure to give the instruction asked for and the giving of the ones that were given was error. The argument is based entirely on the question that has heretofore been considered and decided in this case.

The defendant requested the following instruction:

"You are instructed that where the acts of a person, or group of persons, are merely passive and a nuisance is created and maintained by the active operations of an independent or third person, over whom such passive persons have no supervision or control, before the owner of property injured by the creation and maintenance of such nuisance may recover from the parties who are passive only, such owner must bring to the notice of such passive parties notice of his injury and request the abatement of the nuisance causing damage to him.

"As applied to the facts of the instant case, you are told that if you find a nuisance was created by the city of Wichita, permitting pollutive substances to escape from its custody, and thereby injured the water supply of plaintiff, and that the Continental Oil Company and those associated with it merely delivered the salt and mineralized water to the city and did not permit such substances to escape while same were under their control or custody, then and in that event the plaintiff cannot recover as against the Continental Oil Company or its associates, unless you find from the evidence that the plaintiff gave notice to the Continental Oil Company and its associates of the circumstances of such nuisance and requested an abatement of same."

This was refused. Defendants urge that as error. The instruction and cases supporting it are not in point here. This is not a case where the oil companies passively continued a nuisance. The nuisance was permitting the salt water to escape. There was nothing passive about it. The same may be said with reference to the special questions which defendants sought to submit to the jury.

Defendants requested the following instruction:

"If you find from the evidence that the defendants, and each of them, have discontinued the acts complained of by the plaintiff prior to the time of the trial herein and are now disposing of the alleged salt and mineralized water by draining same through steel casing and inclosed tile sewers into the Arkansas river, and that none of said salt and mineralized water can escape therefrom and that such salt water as is so carried does not and cannot affect the underground waters of plaintiff's water supply, and that such damage, if any, is not of a permanent nature, then your verdict must be for the defendants."

This was refused. Instead the court gave the following instruction:

"If you find for the plaintiff, then you will allow her an amount of money as compensation for the injury which she has suffered by way of loss or damage to her said real property as a direct result of the acts of the defendants. In determining the amount you will allow you will take the difference between a fair and reasonable market value of her property just prior to the pollution of the water thereunder, and the fair and reasonable market value of the property immediately after such pollution. Along with such consideration you should determine whether or not such pollution is permanent or temporary in nature and character."

Along with the argument on these instructions defendants point out the following question that was answered by the jury: Do you find that the waters underlying plaintiff's property are percolating or moving waters? If so, then state the direction of the flow. The answer was "southwest." Defendants argue from this that the injury to the real estate of plaintiff was only temporary and that since plaintiff sued for permanent damages she should not recover for temporary damage. This court has held that proof that damage to real estate would continue for an indefinite time was sufficient to support a judgment for permanent damages. (See *Hall v. Galey,* supra.) The evidence in this case was that the water in plaintiff's well had been sweet and wholesome and fit for drinking purposes, and that since the salt water had been allowed to flow into the canal it has become salty, has an oily scum and is altogether unfit for use for any purpose whatever. This court is not prepared to say that when the substrata has once become saturated with salt from an oil well the water moving through it will cleanse it so that the water in the well will become pure again. The evidence on this point is too vague. We doubt if anybody knows. We think the instructions correctly state the law.

The judgment of the trial court is affirmed.