No. 34,781

EUGENE DONLEY and RACHEL K. DONLEY, *Appellees*, v. AMERADA PETROLEUM CORPORATION AND SHELL OIL COMPANY, INC., *Appellants*.

(106 P. 2d 652)

Opinion filed November 9, 1940.

*Albert Faulconer, Kirke W. Dale, Donald Hickman*, all of Arkansas City, *Victor C. Mieher, Booth Kellough, Paxton Howard* and *Ralph J. May*, all of Tulsa, Okla., for the appellants.

*O. Renn* and *George Templar*, both of Arkansas City, for the appellees.

The opinion of the court was delivered by

WEDELL, J.: This was an action to recover temporary damages to a stock farm alleged to have been caused by the pollution of a creek

which intersected the pasture land. Judgment was for plaintiffs, and defendants, Amerada Petroleum Corporation, and the Shell Petroleum Corporation, have appealed.

Damages were sought and recovered for decreased annual rental value of the farm for a period of two years, October 18, 1935, to October 18, 1937. In addition to recovery of actual damages in the sum of $759, a verdict was returned and judgment rendered in the sum of $500 as punitive damages.

For brevity and convenience we shall refer to the Shell Petroleum Corporation as the Shell, and the Amerada Petroleum Corporation, as the Amerada.

The evidence in behalf of appellees disclosed in substance the following facts: Appellees, Eugene Donley and Rachel K. Donley, owned and operated a farm of 253 acres in Sumner county. The farm was particularly suited to and used for stock-raising purposes. There was about 160 acres of pasture land, about twenty-five acres of timber along the east side, about forty-five acres of tillable land, fifteen acres of orchard and the remainder was occupied by buildings. The farm was well improved. The farm land was located along the west side of the farm. On it was a two-story modern stucco house, a garage, barn and other improvements. A well was located near the house in the northwest corner of the farm. In the timber and on the northeast part of the farm were two fresh-water ponds. Lost creek, which was polluted, entered the farm from the north, and at a point about one-half mile east of the west line. Lost creek was fed by springs. Appellants' oil leases to the north of the farm were first developed in 1928 and 1929. Prior to 1935 the stock used the water from the creek and thrived upon it. In 1935 appellees had thirty head of cows on the pasture. During dry seasons prior to 1935 the creek became substantially dry. In 1935 appellants deepened their oil wells. After their wells were deepened, Lost creek was never dry and always contained a substantial amount of water. Since the deepening of appellants' oil wells, the water in the creek has been salty and has contained a puckery acid taste. Some salt deposit became visible along the edge of the stream. The cattle watered in the creek became thin, their hair became rough and they began scouring. Feed troughs previously located on the west side of the place had to be moved to the fresh-water ponds in the timber. Appellees were obliged to herd the cattle to keep them from drinking the salt water. The milk cows were kept in the pasture

until 1935 when appellees were obliged to remove them, owing to the salt water. In 1937 appellees placed twenty head of calves on the pasture land, but were obliged to remove them by reason of the salt water. The water continued to be very salty. In January of 1937 an inspection was made of the Shell leases which drained into Lost creek above the farm of appellees. In May, 1937, an inspection was made of the Amerada lease and again of the Shell leases. Three Shell leases were inspected. From one of these leases salt water was found running from a tank battery into a branch which drained that lease and from that branch directly into Lost creek. From three wells on the other two Shell leases, salt water was found to have been piped so as to run directly into Lost creek, or into draws through which it entered into Lost creek. In fact, concerning the Shell, there was direct testimony, without objection, that "it was really fixed so the water would run into the creek." On one of the Shell leases a ditch was dug for the salt water to run into the creek. The three Shell leases were operated by the Shell.

In May, 1937, as previously stated, an investigation was made of the Amerada lease. That lease is above the Buffington lease of the Shell. A branch of Lost creek crosses the Amerada lease and empties into Lost creek on the Buffington lease. On the Amerada lease a salt-water pond about seventy-five feet square was discovered. It was found the salt water had been running over the edge of the pond. The water was traced and found to be running down the branch into Lost creek. The branch was about a quarter of a mile long. There were no dams, ditches, basins or anything else built by the Amerada to confine the salt water from this lease. The Amerada was operating the lease. There was testimony the first evidence of salt was observed after October in 1935.

The evidence disclosed the rental value of the farm was $3.50 per acre per annum, prior to the pollution of Lost creek by salt water in the fall of 1935, and that the fair and reasonable rental value of the farm was not to exceed two dollars per acre per annum after pollution. One witness testified the rental value after pollution was one dollar per acre per annum. The jury fixed the damage at $1.50 per acre per annum, which on 253 acres amounted to $759 for the two-year period.

Appellants first contend the evidence completely failed to establish any connection between the operation of their leases and the pollution of Lost creek prior to January, 1937. The contention, in

substance, is based upon the theory the testimony did not disclose the existence, prior to January and May of 1937, of the physical conditions and arrangements on appellants' leases whereby appellants had either permitted salt water to be drained, or had actually emptied it into Lost creek. While we have not deemed it necessary to describe in detail the pipes and contrivances on leases operated by the Shell by means of which salt water on its leases was emptied directly into Lost creek, nor the slough or branch through which the salt water from some of the Shell leases and from the Amerada lease emptied into Lost creek, it is sufficient to say there was ample reason for believing, in conjunction with other evidence, that the man-made devices and natural drains had not been constructed or created upon the exact dates in 1937 when appellants' leases were inspected. It is not contended, nor was there evidence to support the contention if made, that the seventy-five-foot-square pond was constructed on the Amerada lease the day that lease was inspected nor that the long, natural branch through which the surplus salt water from the slush pond flowed into Lost creek had been created on the date of inspection in 1937. The pond was already overflowing on that date. The testimony was that the pond had been overflowing. Water from it was running through a branch approximately one-fourth mile in length before that water emptied into Lost creek.

It is not contended, nor was there evidence to support the contention if made, that the various man-made devices were constructed on the Shell operated leases on the days those leases were inspected. Appellants, of course, knew when those devices had been constructed, but they offered no evidence to cast any light upon that subject. These various circumstances, however, are not the only evidence which reasonably connected appellants with the salt water which had polluted the creek. There was evidence the creek was not polluted with salt water prior to the fall of 1935. Prior to the fall of 1935, Lost creek became practically dry during dry seasons. Appellants deepened their oil wells in 1935. After they deepened their wells the volume of water in Lost creek increased greatly, and there was thereafter a substantial and continuous flow of water even during the dry seasons. After the drilling process was completed, the water also became very salty and was no longer fit for the use of cattle. Appellees' evidence disclosed the exact course of the salt water from the leases of appellants into Lost creek. Appellants

made no effort to show there was any other possible source of salt water than from their own leases prior to January, 1937, or, for that matter, at any other time.

Appellants contend that in order to hold them responsible in damages which resulted prior to January and May, 1937, we must indulge in retrospective presumptions and that such presumptions do not form a basis for liability. In other words, they insist it cannot be presumed from the mere fact that if they polluted the stream after January and May of 1937, they likewise did so since the fall of 1935. In the instant case we are not obliged to deal with that abstract theory. The various circumstances, previously related, were sufficient to submit to the jury the question whether there was a causal connection between salt water in the creek and appellant's operation of their leases. (*Hall v. Galey*, 126 Kan. 699, 271 Pac. 319.) However, in *Phipps v. Flour Mills Co.*, 113 Kan. 118, 213 Pac. 637, touching the subject of retrospective presumptions, this court said:

"The rule that a condition once shown is presumed to continue but not to have existed in the past is not of universal application. Its effect varies with circumstances. A retrospective presumption has been indulged where 'the present condition or state of facts is one that would not ordinarily exist unless it had also existed at the time as to which the presumption is invoked.' (22 C. J. 92.) See, also, *The State v. Durein*, 70 Kan. 1, 9, 11, 78 Pac. 152." (p. 120.)

Moreover, in the instant case, the jury was not obliged to indulge in any presumption relative to the production of salt water by appellants nor concerning the fact that immediately after the deepening of their wells in 1935, salt water had come down Lost creek in substantial quantities. Those facts were established by direct and positive evidence. Furthermore, in the absence of evidence to the contrary, it was a reasonable inference that the man-made contrivances and natural drains or sloughs through which salt water was emptied into the creek, had existed for at least some time prior to the exact dates they were discovered. (*Berwind White Coal Mining Co. v. City of New York*, 48 F. 2d 105, 107.) How long prior to 1937 had appellants been emptying their salt water into Lost creek? They operated the leases and that information was peculiarly within their knowledge or reach. Failure to throw any light upon an issue peculiarly within their own knowledge or reach, raised a presumption open to explanation, of course, that the concealed information was unfavorable to them. (*Fowler v. Enzenperger*, 77 Kan. 406,

94 Pac. 995; *Trust Co. v. Allen*, 110 Kan. 484, 204 Pac. 747.) It may well be that appellants preferred not to introduce evidence in a civil action which would establish or tend to establish criminal guilt under the provisions of G. S. 1935, 55-121, 55-122. That was, of course, a decision upon which they were privileged to exercise their own discretion. The fact they decided not to supply the information did not, however, keep the presumption from operating against them in the instant case.

It may also be noted that appellees were not obliged to exclude every other possible source of pollution after establishing facts from which it reasonably could be inferred that appellants had polluted the stream. The fact that appellants polluted the stream could, of course, be shown by circumstantial evidence. Such evidence in a civil case in order to be sufficient to sustain a verdict need not rise to that degree of certainty which will exclude every reasonable conclusion other than that reached by the jury. (*Railroad Co. v. Perry*, 65 Kan. 792, 70 Pac. 876; *Sternbock v. Consolidated Gas Utilities Corp.*, 151 Kan. 81, 86, 98 P. 2d 162; *Brown v. Clark*, 152 Kan. 274, 277, 103 P. 2d 907.) In other words, appellees having established a cause of action against appellants, it was thereafter not a prerequisite to recovery that it be shown appellants were the sole cause of the pollution. (*Sternbock v. Consolidated Gas Utilities Corp.*, supra, p. 87.)

Appellants next complain of the verdict for exemplary or punitive damages. They urge there was no evidence pollution was the result of willful or wanton conduct. Appellees contend such evidence was ample and that in addition thereto the conduct of appellants constituted the violation of a statute which compels the confining of salt water, and that a statutory penalty is prescribed for its violation. Appellees also contend liability in the instant case is not grounded in the doctrine of negligence, and that liability results, irrespective of negligence, from a failure to confine salt water and in permitting it to escape, to the damage of another. (*Berry v. Shell Petroleum Co.*, 140 Kan. 94, 101, 33 P. 2d 953.) It is true we have a statute which makes it a duty to confine salt water produced from oil wells. (G. S. 1935, 55-121.) Knowingly or willfully violating the statute constitutes a misdemeanor, and is punishable by fine or imprisonment, or both. (G. S. 1935, 55-122.) It seems, however, that under the majority rule exemplary or punitive damages cannot be recovered merely upon the ground the act complained of is forbidden by statute

and that its violation constitutes a crime. (2 Sutherland on Damages, 4th ed. 1289, § 394; 17 C. J. 984, § 281.) In the latter authority the rule is stated as follows:

"An act will not be deemed malicious, and so warranting punitive damages, merely because it is unlawful or wrongful. Nor would the circumstance that defendant would be liable to a criminal prosecution for the act complained of be in itself sufficient to determine his liability in exemplary damages. *But it has been laid down as a general proposition that the intentional doing of a wrongful act with full knowledge of its character, and without cause or excuse, is malicious so as to warrant an award of exemplary damages.*" (Emphasis supplied.) (See, also, 15 Am. Jur. 713, §§ 278, 279; 20 R. C. L. 20, § 15.)

That the acts of appellants were wrongful is not open to dispute. That the acts of the Shell were intentional, with full knowledge of their character and without cause or excuse is established by clear, strong and convincing evidence. There was not only circumstantial, but direct evidence its acts were deliberate. The case of the Amerada differs from that of the Shell, if at all, only in degree. It dug a slush pond which was obviously inadequate to effectively confine the volume of salt water it produced. It operated the lease. It could not help but know what any casual observer could see. It would indeed constitute a dangerous doctrine to declare that all a producer of salt water was required to do in order to escape liability, actual or punitive, was to dig a slush pond, and that thereafter he was under no duty or obligation to prevent its overflow to the damage of others. The overflow followed a long branch into Lost creek. No dams, ditches, basins or anything else were constructed to confine the salt water. In the absence of any evidence to the contrary the jury was justified in finding the surplus salt water from the pond was intentionally emptied into Lost creek.

We are urged to remand the case for retrial. Appellants contend they did not have a fair and impartial trial by reason of prejudicial remarks made by counsel for appellees in the course of the trial. Several references were made to appellants as criminals. The trial court admonished counsel to refrain from such remarks, but when they were first made the court did not instruct the jury to disregard the remarks. The court did admonish the jury to disregard the remarks when a similar reference was made on a later occasion. As previously indicated, G. S. 1935, 55-122, makes it a crime to knowingly or willfully violate G. S. 1935, 55-121. Although the question of willful violation of the statute was an issue under the claim for punitive damages, counsel should have refrained from the references

in question. Appellants were not being tried on a criminal charge. The references had no place in the lawsuit. If we entertained any doubt as to the sufficiency of the evidence to sustain the verdict or concerning its excessiveness, the complaint might well be serious. In view of the fact we do not entertain such doubt and since it·is not contended the verdict is excessive, but on the contrary is conceded it was not, it is difficult to see in what manner the substantial rights of appellants were prejudicially affected. Certainly such prejudice does not affirmatively appear. Under those circumstances we are not permitted to remand the case for retrial. (G. S. 1935, 60-3317; *Firmin v. Crawford,* 140 Kan. 370, 36 P. 2d 970; *Jacobs v. Hobson,* 148 Kan. 107, 79 P. 2d 861.)

In view of what has already been said concerning the principal errors urged, it becomes unnecessary to treat some questions presented by appellants. All other minor complaints have received our careful consideration, but they are not of sufficient importance to affect the judgment or to require treatment.

The judgment is affirmed.