No. 37,764

CARRIE WENDTLANDT, MARY J. RAMSEY, CAROLINE A. GERRITSON, ROSE H. MILLER, AGNES G. ARENDS, PAULINE J. McLEAN, PHILLIP PENKA, Administrator of the Estate of Emma A. Penka, Deceased, PHILLIP PENKA, Guardian of the Estate of Lawrence Penka, Bernard Penka and Hilda Marie Penka, Minors, *Appellees*, v. THE NATIONAL COOPERATIVE REFINERY ASSOCIATION, *Appellant*.

(215 P. 2d 209)

Opinion filed February 28, 1950.

*Wm. F. Pielsticker,* of Wichita, argued the cause, and *R. C. Russell* and *Isabel Obee,* both of Great Bend, and *E. H. Hatcher* and *Harold E. Jones,* both of Topeka, were with him on the briefs for the appellant.

*Boyce P. Hardman,* of Great Bend, argued the cause, and *Herbert Diets,* of Great Bend, was with him on the briefs for the appellees.

The opinion of the court was delivered by

HARVEY, C. J.: Plaintiffs brought this action to recover actual and punitive damages alleged to have resulted from salt water which defendant permitted to escape from a salt water disposal pond operated by it in connection with oil wells on plaintiffs' land. A trial by jury resulted in a judgment in favor of plaintiffs of $1,092 for actual damages and $5,000 for punitive damages. Defendant has appealed.

In the petition, filed July 9, 1948, plaintiffs alleged that they were the owners of the east half of a described quarter section of land in Barton county upon which defendant was operating under an oil and gas lease; that in doing so it was permitting large quantities of salt water to escape from a salt water disposal pond it had constructed upon the premises, to such extent that approximately ten acres of plaintiffs' land had become saturated with salt water, destroying the land for cultivation and other farming purposes and causing a complete loss thereof; that the pollution of plaintiffs' land is constantly spreading and increasing and thereby will prevent plaintiffs from using additional acreage of the land for farming purposes; that prior thereto plaintiffs' land, exclusive of the mineral rights thereunder, was of the value of $12,000, but owing to the pollution of the land the fair and reasonable market value of the land, exclusive of mineral rights thereunder, is now $6,000, and that plaintiffs have sustained damages from such pollution in the sum of $6,000. It was further alleged:

"That all of said damages complained of were caused by the defendant unlawfully permitting the salt water to escape from said oil wells and salt water disposal ponds as aforesaid and to flow over, into and upon plaintiffs' land; that the defendant knew or had good cause to know that the salt water which it was producing from said oil wells would and was escaping as described herein and that plaintiffs would thereby be damaged; that the defendant at all times herein referred to knew all of said acts of omission or commission narrated herein were in violation of the laws of this state, including without limitation, G. S. (1935) 55-121, and that said acts constituted and were an unlawful nuisance; that said defendant did willfully and intentionally and in utter disregard of the rights of the plaintiffs and the laws of this state permit the salt water to escape and flow from said oil wells and salt water disposal ponds as aforesaid and damage plaintiffs' land as hereinabove described; and

that by reason of said harmful, willful, intentional and unlawful acts, the plaintiffs are further entitled to punitive damages in the sum of $5,000.00."

The prayer was for damages in the sums alleged, with interest, and also that defendant be permanently enjoined from causing and permitting the salt water to escape from its wells and salt water disposal ponds located on plaintiffs' land.

In its answer defendant admitted its corporate existence and that it was the owner and operator of an oil and gas mining lease on the land and generally denied all other allegations of the petition.

At the trial, which began April 11, 1949, counsel for plaintiffs in an opening statement briefly summarized the allegations of the petition and counsel for defendant in an opening statement pointed out that it was a suit by a lessor against a lessee, admitted that it operated the wells and that salt water escaped from the ponds and that defendant produced the water with the oil, and stated the principal question involved would be the value of the land.

The evidence disclosed that all of the eighty acres was cultivated land used for the growing of wheat. It had been leased for oil and gas and under it a well had been completed in May, 1943, and another in September, 1944. Defendant purchased the leasehold estate and took possession July 1, 1947, and began to operate the wells. At that time, in addition to the two wells on the premises, there was on the lease a tank battery located about midway from east to west and about 800 feet south of the north line. About 80 feet north of the tank battery was located a small "B. S." pond, a term frequently used in the oil field as indicating a miscellaneous class of oil refuse. After defendant began its operation the wells began to produce salt water, which was noticed in the fall of 1947. By early in 1948 the wells were producing large quantities of salt water and defendant constructed a large salt water disposal pond. This was situated about 50 feet west and 50 feet north of the tank battery. It was constructed by scooping out the dirt and putting in ridges around the sides. The dirt was porous and the pond would not hold water. It was built to a capacity of 3,500 barrels. Into this defendant turned 5,100 barrels of salt water every thirty-day month, which water escaped from the bottom and the sides of this storage tank. Before this action was brought it had spread over several acres to the west, north and east of the tank, and perhaps some to the south, and down into the ground to a stratum of rock about 30 to 36 inches below the surface, with the shale above it

several inches thick and along the top of this stratum of rock. Some of the water came out of the sides of the pond in rivulets, and across the surface of the land. Over the area where this saturation of water was most complete all vegetation was killed except Russian thistle and some types of salt grass. Farm machinery could not be driven over it without miring down. This situation was discovered by plaintiffs as early as June, 1948, and they called upon Mr. John C. McFarland, district geologist for the oil field section of the Kansas State Board of Health, to make an examination. Mr. McFarland's qualifications were admitted. He went to the premises one time in June—the exact date not shown—but it was directly after a heavy rain and he could not make the examination. He returned to the lease on July 7 and took a number of tests and examined the premises. He took samples of water from various places and analyzed it. The water from the pipe leading from the gun barrel tested 11,000 parts per million of chlorides. The water from the west pond tested 10,800 parts, and from a little puddle to the north of the pond it tested 9,000 parts. Tests were made from other places varying in distance from the salt water pond and from water collected in holes dug by a post augur to the rock stratum, which varied from 4,000 to 10,000 parts per million of chlorides. He found that although the pond held only 3,500 barrels they were running 5,100 barrels per thirty-day month into the pond. There was no evidence that the pond had ever overflowed. It did not run over the top because the seepage was great enough to take care of the water being put in it, since it was seeping out as fast as it was running into the pond. The area impregnated with salt water was in the direction north from the tank battery to the north line of the lease and in a direction west to the west line. The extent it would spread to the south would depend upon the level of the underlying stratum of rock. Sufficient tests were not taken to determine that accurately. "If nature takes its course, it will take anywhere from 15 to 50 years for the land to clear up." This would vary largely in the extent of rainfall and the time might be shortened by certain types of cultivation. On July 7 he went to Mr. Harry T. Black, defendant's state superintendent of production, and told him about his examination of the premises. The witness testified:

"At that time Mr. Black stated that he knew there was a bad condition on the lease, and that they had the material for a line to put a disposal system in to take care of the waste water that was escaping."

McFarland further testified that it is a matter of common knowledge in the oil field in that part of the state that an earthen pit would not hold the water. The porosity and permeability of the soil is such that the moisture will seep or percolate through the soil to the first impervious layer below the surface.

There was much further evidence by lay witnesses along the same line. There was also testimony that the reasonable market value of the eighty-acre tract of land, not considering the oil rights, before it was permeated with salt water, was $12,000, and after it was permeated the value was only $6,000.

Mr. Black told Mr. McFarland that the material was available and they were making plans to put the salt water in a salt water disposal well on the Grosshardt lease approximately a mile and a half southeast of the lease in question. The salt water disposal line was laid to the Grosshardt lease and completed on September 10, 1948. After that no more salt water was put into the salt water pond on plaintiffs' land.

The court in its instructions summarized the pleadings and told the jury:

". . . that the defendant in the case has admitted in open court that it is liable to the plaintiffs in damages on account of the fact that salt water seeped from its salt water ponds over and through the plaintiffs' land, and it will thus not be necessary for the jury to decide that question. The defendant is contesting the amount of damages claimed by the plaintiffs, however, and therefore the only matters for the jury to decide in this case are first, the amount of actual damages suffered by the plaintiffs, as proven by a preponderance of the evidence in this case, and second, whether the plaintiffs are entitled to punitive damages from the defendant, and third, the amount of such punitive damages."

The court quoted G. S. 1935, 55-121, and gave further instructions covering the question of actual damages and of punitive damages. Counsel for defendant made no objection to any of the instructions given by the court, neither did they request any instructions, and specifically asked the court to let the record show that defendant was making no request for instructions.

After argument by counsel for plaintiffs the defendant waived argument and the case was submitted to the jury. After considering the case the jury returned a general verdict in favor of plaintiffs and against the defendant for $6,092. Answering special questions they found that two acres were permanently ruined, and for that land they allowed the sum of $300. They found that four acres

were temporarily ruined. The total amount allowed for actual damages was $1,092, and they allowed for punitive damages the sum of $5,000.

Thereafter defendant filed two motions—a motion for a new trial, which set out five of the statutory grounds for a new trial in statutory language, and also a motion for the court to enter an order remitting to defendant all of the award for $5,000 punitive damages for the reasons that the rights of defendant were substantially affected and prejudiced during the trial by misconduct of the jury and by accident and surprise which ordinary prudence and diligence of counsel could not have guarded against; because of erroneous rulings and instructions of the court; because of the instructions given by the court with reference to G. S. 1935, 55-121 and 55-122; because the court permitted counsel for plaintiffs to refer to the above mentioned criminal statute during his argument to the jury, and because the award of punitive damages was obviously given under the influence of passion and prejudice and that the same is contrary to the evidence and contrary to the law.

Both motions were heard and overruled. There is nothing in the record to indicate that any evidence of any character was introduced by defendant in support of either of the motions.

Counsel for appellant contend that the court erred in instructing the jury as to the criminal statute pertaining to pollution. Appellant is not entitled to be heard upon that question. In its instructions the court embodied the provisions of G. S. 1935, 55-121. It did not embody the next section, 55-122, as appellant's argument and brief would lead us to believe. No objection was made to the instruction given. In *Berry v. Shell Petroleum Co.*, 140 Kan. 94, 33 P. 2d 953, at page 101, in discussing the statute, it was said:

"Such a statute was not needed, however, to make the oil companies liable for damages caused by the escape of salt water from the premises of the company. This has been the law ever since the case of *Fletcher v. Rylands,* supra. [L. R. 1 Exch. 265 (1866).] The statute only made it possible that the companies could be compelled to keep the salt water confined without waiting for any person to be damaged."

We think it was appropriate for the court to embody this statute in its instructions.

Counsel for appellant next contend the court committed error "in restricting defendant's testimony as to good faith in preventing the damage." There is much more in appellant's argument and

brief about its good faith in preventing damages than there was in the evidence; in fact, there was very little in the evidence. When Mr. McFarland talked to Mr. Black on July 7, among other things Mr. Black stated the company planned to put the salt water in a disposal well on the Grosshardt lease, a mile and a half from plaintiffs' land, and that they had the material on hand to do that. This, and the fact that it did lay a pipe line to the Grosshardt lease for the disposal of the salt water in a disposal well on that lease, which was completed on September 10, is about all the evidence in the record pertaining to defendant's good faith. While Mr. Black was giving his testimony about the kind of pipe used in conveying the salt water from plaintiffs' lease to a disposal well on another lease he was asked by defendant's counsel: "What was the cost of that pipe?" The question was objected to and the objection was sustained. That is the only restriction of defendant's testimony as to its good faith shown by the record. On the hearing of the motion for a new trial it was not shown by affidavit or otherwise what answer the witness would have given to that question had he been permitted to answer. Under our statute (G. S. 1935, 60-3004) the appellant has not made a sufficient record to be entitled to have the ruling of the court reversed.

Counsel for appellant present the question: "Was the evidence sufficient to support an allowance for punitive damages?" As framed, it is a question more properly to be submitted to the trial court. It was not submitted to the trial court until after the verdict. In the petition plaintiffs had claimed to be entitled to punitive damages and alleged the facts which they felt would sustain such damages. The trial court submitted the question of punitive damages to the jury in a lengthy instruction, to which defendant made no objection. We have examined it and find that it is not inherently defective. A special question was submitted to the jury as to the amount, if any, they allowed for punitive damages. Whether the court was requested by defendant to submit this question, or the court submitted it on its own motion, is not disclosed, but it is clear that defendant did not object to it. At no time during the trial did defendant, by motion or otherwise, object to the trial of the case for both actual and punitive damages. After the verdict defendant filed a motion asking the court to enter an order remitting to defendant all of the award of $5,000 for punitive damages made by the jury. We regard this as a motion addressed to

the sound discretion of the court. It was denied. In the brief in this court counsel for appellant point out that in answering special questions the jury found two acres of land, of the value of $300, to have been permanently ruined. They found that four acres were temporarily ruined, but were not asked and did not place the amount of damages on that four acres. They did allow plaintiffs $1,092 for permanent damages and $5,000 for punitive damages. Without raising any question as to the amount of actual damages allowed by the jury counsel stated this fact as indicating prejudice of the jury. in allowing punitive damages. We think that inference untenable. Reading the record, we are inclined to the view that if the allowance to plaintiffs for actual damages indicated a leaning toward one party or the other it was against the plaintiffs, not the defendant. In their petition plaintiffs had alleged that the value of the tract of land, exclusive of mineral rights, was $12,000 before it was polluted by defendant by the salt water and only $6,000 after its pollution, and by reason thereof plaintiffs had sustained actual damages in the sum of $6,000. Several witnesses sustained that allegation by their testimony. The court in its instructions advised the jury that the measure of actual damages suffered by plaintiffs would be the difference between the fair and reasonable value of the land, exclusive of the mineral rights, just prior to the pollution and such value after the pollution. Hence, the jury might have found the actual damages to have been $6,000 instead of $1,092. However, plaintiffs filed no motion for a new trial and have filed no cross-appeal, hence the question whether the jury erred in its allowance of actual damages is not before us.

In view of the fact that defendant joined in submission of the question of punitive damages to the jury, and raised the question only after the verdict, and then by a motion which was simply addressed to the sound discretion of the trial court, we might very well say that appellant does not have the question now presented before us. Passing, without deciding that question, we find an abundance of evidence in the record for submitting to the jury the question of punitive damages. Some of this evidence has already been set out or referred to in this opinion. We shall not repeat what has been said nor enlarge upon it further than to say the record discloses defendant built the salt water pond in January, 1948, by simply scooping out some dirt and placing it around the edges of a pool. The character of the soil was such that it would

not hold water, a fact of which defendant was well aware. Although its capacity was but 3,500 barrels there was put into it 5,100 barrels per month. It never overflowed. The water seeped out through the bottom and sides of the pool and permeated the soil. Defendant knew that was being done. It was done intentionally. It had continued about five or six months when McFarland talked with defendant's superintendent, Mr. Black, on July 7. Mr. Black was frank enough to say that he knew the situation was bad. But defendant continued that for more than two months thereafter. When defendant found that the wells were producing large quantities of salt water with the oil it might have stopped pumping until it had a proper place to dispose of the salt water without damage to plaintiffs. Perhaps it was getting enough oil out of the wells to justify it in continuing to produce oil and salt water, even though it damaged plaintiffs' land. Certainly defendant took no effective steps to prevent such damage. The jury was justified in concluding that the turning of the salt water on plaintiffs' land was intentional, that defendant knew damage to the land was being caused and apparently was indifferent as to the consequences. We cite but a few cases of the many which might be cited holding that such conduct justified punitive damages. (*Berry v. Shell Petroleum Co.*, 140 Kan. 94, 33 P. 2d 953; rehearing denied, 141 Kan. 6, 40 P. 2d 359; *Donley v. Amerada Petroleum Corp.*, 152 Kan. 518, 524, 106 P. 2d 652; *Rusch v. Phillips Petroleum Co.*, 163 Kan. 11, 180 P. 2d 270.)

Since defendant intentionally emptied salt water on plaintiffs' land, knowing it would cause serious damage thereto, the case is an appropriate one for the allowance of punitive damages. (*Stoner v. Wilson*, 140 Kan. 383, 36 P. 2d 999; *Motor Equipment Co. v. McLaughlin*, 156 Kan. 258, 133 P. 2d 149, and *Glass v. Brunt*, 157 Kan. 27, 31, 32, 138 P. 2d 453.) However, we think the allowance in this case for punitive damages was excessive by as much as $2,500 in view of the fact that plaintiffs made no complaint to defendant until a few days before the action was brought, and the further fact that similar salt water disposal ponds were used at many of the wells in that area. If the plaintiffs will accept a remittitur of the sum of $2,500 in the punitive damages, and so notify the clerk of this court within fifteen days after this opinion is filed, the judgment will be affirmed for the permanent damages of $1,092 and for punitive damages in the sum of $2,500. Unless such remittitur is

consented to the judgment of the trial court will be reversed with directions to grant a new trial on all issues.

It is so ordered.

SMITH and ARN, JJ., dissent as to the order of remittitur.