No. 23,508.

FEDERAL TRUST COMPANY, *Appellant*, v. F. S. ALLEN et al., *Appellees*.

SYLLABUS BY THE COURT.

1. MATERIAL EVIDENCE—*Witness Withheld—Presumptions—Inferences.* Where a party has it within his power to produce witnesses, presumably favorably disposed toward him, to explain a transaction or answer a controverted question, his failure so to do, unless satisfactorily explained, justifies an inference that the testimony if produced would be unfavorable to his side of the controversy.

2. JURISDICTION — *Appointment of Guardian — At Permanent Residence of Ward.* The jurisdiction to appoint a guardian over the person and estate of a lunatic or person incompetent to manage his affairs, belongs exclusively to the state where such person has a permanent residence.

Appeal from Butler district court; ALLISON T. AYRES, judge. Opinion filed February 11, 1922. Reversed.

*Bennett R. Wheeler, S. M. Brewster, John L. Hunt,* all of Topeka, *A. L. L. Hamilton,* and *J. B. McKay,* both of El Dorado, and *George A. Adams,* of Lincoln, Neb., for the appellant.

*B. R. Leydig, K. M. Geddes,* and *E. W. Grant,* all of El Dorado, for the appellees.

The opinion of the court was delivered by

PORTER, J.: The action in the district court was for the writ of habeas corpus. The petitioner is The Federal Trust Company, a Nebraska corporation, and claims the right to the custody of Emily J. Weston, a feeble-minded person, by virtue of its appointment as guardian of her person and estate by the county court of Lancaster county, Nebraska. The respondent, F. S. Allen, claims the right to her custody by virtue of an appointment as guardian by the probate court of Butler county, Kansas. Charles A. Weston is a stepson of Emily J. Weston and he and his wife are the other respondents.

On November 23, 1920, a petition was filed in the county court of Lancaster county, Nebraska, charging that Emily J. Weston was incompetent to have the management of her property and that she was detained in El Dorado, Kan., by her stepson, Charles A. Weston, and asked for the appointment of a guardian. The hearing was set for December 27, 1920. Notice as provided by the statutes of Nebraska was given by publication to all persons interested and a certified copy of the notice was delivered to Emily J. Weston, on November 25, 1920, at the home of her stepson in El Dorado, Kan. On the date appointed, December 27, 1920, the matter came on for hearing before the Nebraska court, and an order was made appointing the

petitioner as a suitable corporation to act as such guardian. On December 20, 1920, Charles A. Weston filed a petition in the probate court of Butler county, asking for a similar appointment under the laws of this state. On the 27th day of December, 1920, the same date on which the Nebraska court made the order appointing the petitioner, the probate court of Butler county took jurisdiction of the matter, found there was no occasion for empanelling a jury and appointed a commission of two doctors; and upon their report appointed F. S. Allen guardian of the person and estate.

The petition for the writ in this case alleged that Emily J. Weston at all times mentioned therein has been and is a citizen and legal resident of Nebraska and had been for more than thirty years. It set forth the proceedings in the Lancaster county court, pleaded the laws of Nebraska with respect to the jurisdiction of that court, and attached certified copies of the letters of guardianship; alleged that the probate court of Butler county had no jurisdiction, and that the Westons procured the appointment of a guardian in pursuance of a fraudulent intention to obtain possession of the person and property of Emily J. Weston, and to deprive her children of her custody and society.

The return of F. S. Allen set out the proceedings in the Butler county court and asked that his right and authority as guardian be confirmed, and that the prayer of the petitioner be denied.

The respondents, Charles A. Weston and wife, filed their return, adopting the statements and denials in the return of F. S. Allen, and alleged that they had been employed by him as guardian to take care of Emily J. Weston, and that their employment had been confirmed and approved by the probate court. At the close of the testimony the district court rendered a judgment in favor of the respondents and against the petitioner. The appeal is from that judgment.

There is a statement in the journal entry to the effect that the court made findings in substance that on the 20th day of December, 1920, Emily J. Weston was and "for some time prior thereto had been and has been ever since" a resident of Butler county, Kansas; that during November and December, 1920, and January, 1921, she "was not a resident of and had no property, either real or personal within Lancaster county, Nebraska." In respondents' brief it is insisted that in a proceeding in habeas corpus to secure the possession and control of an elderly person, such as is Emily J. Weston, "the

controlling feature in the disposition of the case should always be, what the best interests, comfort and welfare of such old person demand and require. It seems to us that this is what the court should be guided by in determining the matter. We think the trial court largely accepted this view. In fact we know that he did." The brief comments on the fact that Emily J. Weston has been receiving the care and attention she requires "since she came to Kansas," and is not compelled to move about from one place to another; that her welfare demands a permanent home and "that the court wisely determined that the writ should be denied so that she could enjoy the home she had known for a number of months." To this contention we cannot agree. The lawful guardian of the person and estate is entitled to the custody. The order of the court appointing the lawful guardian cannot be set aside because another court might think the ward would be better cared for by a different guardian.

The uncontradicted evidence shows that Emily J. Weston had lived in Nebraska about fifty years prior to the time she was brought by her stepson in May, 1920, to his home in El Dorado, Kan. At the time of the trial she was seventy-eight years old; she has six married children, two of whom live in Lincoln, another on a farm twelve miles from Lincoln, one in Burwell, Neb., one at Woodlake, Neb., and one in Portland, Ore. She has a number of grandchildren living near Lincoln. She and her husband lived on a farm for more than thirty years which was three or four miles from Lincoln. On the death of her husband she was appointed executrix of the estate, which consisted of 149 acres of land and other property. She continued to reside on the land and farmed it herself until about four or five years ago, since which time she has lived with her married children who reside in Nebraska.

George A. Adams, a lawyer of Lincoln, who had known her for twenty-eight years and had represented her as executrix of the estate, testified in substance as follows: He first became acquainted with Charles A. Weston when he threatened to contest his father's will if not permitted to participate in the division of the estate at the old lady's death; and it was finally agreed that he should at the time be treated as one of her children so far as a division of her property was concerned. Afterwards in September, 1919, he came to the witness's office in Lincoln to see about the sale of the real estate. The land was partitioned in 1920 and Mrs. Weston realized something more than $7,000 from the sale; she had other property and

securities kept in a box belonging to her in the Lincoln Safe Deposit Company; the witness had the key part of the time, and she had it part of the time. He had a conversation with Charles A. Weston, who spoke about the old lady making him a visit; asked if witness was looking after her business, and wanted to know if it would be all right. Mr. Adams said, "Of course, she can go if she wants to." The subject of her making this visit was talked over probably a half dozen times in her presence; she did not seem to want to go and said she had just been down to visit him and it was a big, long ride and she did not care much about going. On one occasion she said, "If I get down there and Charles don't bring me back, how will I get back?" Charles said, "Don't be uneasy about that, mother, I'll bring you back." The witness said, "If he don't, some of the girls will go after you."

Three of the daughters, a daughter-in-law, and a son testified to similar conversations with Charles Weston before their mother was taken to Kansas, and that at no time did he make any suggestion of her making her home with him; it was the understanding of all the children that she was to go and make a visit, stay as long as she wanted and come back to the rest of the children. No one of the family learned that the mother's notes, securities and money had been taken away from Lincoln until after the appointment of a guardian in Nebraska.

The attorney, Mr. Adams, further testified that in May, 1920, when Charles Weston brought his stepmother to Kansas, her mental condition was very feeble, her memory faulty, her conversation disconnected and rambling; that she had been in this condition four or five years; talks had been had at various times in reference to appointing a guardian for her, but no formal steps had been taken until November 22, 1920; that when Charles Weston went to Lincoln and took her to El Dorado she was living around among her daughters; with Edith Densberger at University Place, near Lincoln; that when that daughter moved to Cherry county she went to her daughter Stella's place in Lincoln; so far as he knew there was no estrangement of any kind between her and her children.

Mrs. Nora M. Tatum testified by deposition in substance that she was superintendent of the vaults of the Lincoln Safe Deposit Company; that Emily J. Weston had box No. 6743; on April 30, 1920, Charles Weston came to the vault alone and asked permission to go to Mrs. Weston's box; witness told him he had no right to admission,

that only George A. Adams and Mrs. Weston had that right; he said he merely wanted to make some investments for Mrs. Weston; she referred him to Mr. Adams and he went out of the building; she called Mr. Adams over the phone; both came in and signed for admission to the box; took the box into the booth together and Mr. Adams came out and left Charles Weston in possession of the box. On that date Charles Weston made investments of about $9,000 in securities and cashed in some of the others in order to pay for them.

Mr. Adams's testimony with respect to this matter is that about the time Charles returned to Kansas with Mrs. Weston he was called to the bank over a matter connected with the safe deposit box. "I was called by the lady who has charge of the box by 'phone and asked to bring the key over. . . . I started over and met Charles Weston at the landing of the elevator. He was just starting up to my office. . . . We went back together and I handed the key to the lady in charge and she unlocked the drawer and handed it to me." He and Charles went into the booth and opened the box. Charles said, "We have examined the other securities we are going to buy and I will bring in the party who handles them"; he stepped out and soon came back; he said the party could not come then; "and I said, 'I can't wait,' and I left him there." These securities were in the box of Mrs. Emily J. Weston and belonged to her. The next time the witness saw the box was on the Wednesday prior to the hearing of this case. He examined it and found in it only a few old papers, a certified copy of the husband's will, a copy of her letters of executrixship and a certificate of her marriage. He testified that he turned the key over to Charles Weston because of his absolute confidence in him; he first learned that the securities had been taken to Kansas on January 10, 1921, when Charles told him at his home in El Dorado. He asked Charles why he brought the securities to Kansas, and he said that was a matter for him to determine; witness asked how many securities there were, and he answered, $10,000. Mr. Adams said the guardian gave bond that indicated $9,000. Charles said, "I have got the balance," and that he had cashed one $500 bond.

The referee in the partition suit testified that he sold the land belonging to the estate and paid Emily J. Weston a part of her share in checks; that the checks were returned indorsed "Emily J. Weston, per C. A. Weston."

The evidence shows that the children first learned of the proceedings in the Kansas court, and that their mother's money and securities had been taken from the safe deposit vaults and brought to Kansas on the 10th of January, 1921, when the attorney, Mr. Adams, and a granddaughter of Emily J. Weston went to El Dorado to take her to Nebraska. Mr. Adams testified that when they went to the home of Charles Weston his wife said they could not see the old lady. When asked the reason she said, "Charles will be here at noon and he will tell you why." The granddaughter was not permitted to see her grandmother. Witness returned at noon; his testimony as to what occurred follows:

"Charles came to the side door. Couldn't get in the front door, and went to the side door, and the screen was hooked. He opened the inside door and I said, 'How do you do, Charlie?' and he spoke to me. And I said, 'I would like to talk with you a little, Charlie.' He didn't open the door and I saw he wasn't going to invite me in, and he unlatched the screen door and stepped out and his wife stood inside with the inner door just ajar. I said 'I would like to see your mother,' and he says, 'You can't see her,' and I said 'Why?' and he said 'You'll have to have authority or papers to see her,' and I said, 'I have copies of the letters of guardianship from Lincoln,' and he said, 'They are no good; I've got a guardian appointed down here.' He was excited, and—.

"Q. Did you get to see Mrs. Weston? A. I did not."

After a demurrer to the evidence of petitioner was overruled, the wife of Charles A. Weston was called as a witness for the respondents. Her testimony was to the effect that Emily J. Weston had visited them ten or fifteen years ago, but had never made another visit until Charles Weston brought her down for about a week and then returned with her to Nebraska, and that six months later he brought her back on May 1, 1920. She testified that she had taken good care of her, and at times had to wait on her as she would a child. She contradicted none of the statements of witnesses for the petitioner as to what occurred in their visits to El Dorado to see Emily J. Weston.

F. S. Allen, the Kansas guardian, testified that he had about $10,000 on hand belonging to Emily J. Weston, and that he did not know whether he was paying Charles A. Weston $40 a month for taking care of her or not; he had never seen his ward until the hearing of this case.

Dr. R. B. Earp, who had treated Mrs. Weston for a fracture of her arm, was also a witness for the respondents. He testified that

he had observed her mental condition and that she did not have enough mentality to realize whether Kansas or Nebraska was her home; that she was not capable of having an opinion of her own as to where she would like to live, and that she would not realize whether this was her permanent home or whether she was visiting; that she did not have the power of memory to talk of family affairs.

The testimony of Doctor Earp supplements that offered by the petitioner and establishes the fact that Emily J. Weston's mental condition for several years had been such that she was not capable of changing her legal residence at the time she was brought to Kansas. That she never became a resident of this state, and that her residence is in Lancaster county, Nebraska, is established, in our opinion, from the uncontradicted evidence. There is no evidence that she ever expressed an intention of abandoning her residence of fifty years or more in Nebraska, or of taking up a residence in Kansas. When she was old, mentally incompetent and feeble, she was brought here with the understanding of her children and herself that she was coming for a short visit and would be taken back to her home whenever she wanted to go. The circumstances under which the respondent, Charles A. Weston, secured possession of her property, and enticed her away from where her children lived, and where her home had been, need no comment. He was present at the trial but did not testify. The statements in the testimony of petitioner's witnesses of what occurred in conversations with him in Nebraska and at El Dorado stand uncontradicted.

The established rule, at least in civil cases, and applying alike to plaintiff and defendant, is that where a party has it within his power to produce witnesses, presumably favorably disposed toward him, to explain a transaction, or answer a controverted question, and fails so to do, it will be presumed that the testimony if produced would be unfavorable to his side of the controversy. (*Fowler v. Enzenperger*, 77 Kan. 406, 94 Pac. 995; 10 R. C. L. 885; 1 Wigmore on Evidence, § 285; Note, Ann. Cas. 1914A, 909 *et seq.*) Courts and text-writers generally speak of it as a presumption, but it is more properly defined as an inference of fact, and not as a presumption of law. The Fowler case, *supra*, recognizes a qualification of the rule, adopted generally, that the inference will not be drawn if the failure to produce the evidence is satisfactorily explained.

It is said in the brief for the respondents that Charles A. Weston's excuse for not testifying was put into the record by answers to ques-

tions on the cross-examination of Mr. Adams, which show that the attorney of the family had presented the matter to the prosecuting attorney at Lincoln, Neb.; that a warrant had been sworn out charging Charles A. Weston with larceny and kidnapping; and that an officer from Nebraska was then present with the warrant. In the little domestic tragedy unfolded by the record in this case, Charles A. Weston was the moving actor. The explanation for his failure to testify in this civil proceeding is far from satisfactory to the court, and tends rather to create an unfavorable impression and to justify the application of the rule of evidence which regards his silence as an admission that any truthful testimony he could give would not help the respondent's case.

In this state it has been held that the jurisdiction for the appointment of a guardian of a minor is in the county of the minor's domicile in the absence of any express statute upon that question. (*Connell v. Moore,* 70 Kan. 88, 78 Pac. 164.) And in *Foran v. Healy,* 73 Kan. 633, 85 Pac. 751, it was held that the jurisdiction to appoint a guardian over the person and estate of a lunatic belongs exclusively to the probate court of the county where such lunatic has a permanent residence. By analogy there is every reason to hold that the jurisdiction to appoint a permanent guardian over the person and estate of a lunatic belongs exclusively to the courts of the state where such lunatic has a permanent residence.

Every presumption is in favor of the regularity of the proceedings in the Nebraska court, and indeed there is no contention that the court there did not have jurisdiction if the question of the residence of Emily J. Weston is determined adversely to the respondents.

In the *Foran v. Healy* case, *supra,* this court recognized the authority of the probate court of the county where the insane person was found, to appoint a guardian and to commit the insane person to a state institution, and held further that the adjudication in that county was conclusive on the question of insanity, and for that reason the probate court of the county where the insane person's legal residence was, could, in reliance upon the former adjudication, appoint a guardian of the estate. It was also decided that the guardianship in the county where the insane person was found was merely ancillary to that of the main guardianship which was in the court of the legal residence of the person. The statute involved was section 3941 of the General Statutes of 1901, since repealed but in

substance reënacted (Laws 1917, ch. 165), so that the jurisdiction of a probate court to appoint a guardian for anyone found to be insane in the county is substantially the same as when the case just cited was decided.

In the present case the appointment of a guardian for Emily J. Weston by the Kansas court has doubtless resulted in protecting and conserving her property. The court deems it proper, in order to prevent any likelihood of an unseemly conflict between the courts of this and a sister state, to suggest that if the appeal here involved the right to the possession of the property of the ward, it would doubtless be held that the Kansas guardianship is merely ancillary to the domiciliary guardianship in Nebraska, and also that the petitioner is entitled to the possession of the property belonging to its ward.

It follows that the county court of Lancaster county, Nebraska, had jurisdiction to appoint the petitioner as guardian, and that the petitioner is entitled to the custody of the person of Emily J. Weston.

The judgment is reversed and the cause remanded with directions to issue the writ.