No. 43,694

In the Matter of the Application of Eleanor Miller Stafford for a Writ of Habeas Corpus. ELEANOR MILLER STAFFORD, *Appellant*, v. WALTON GOODE and EUNICE A. GOODE, *Appellees*.

(392 P. 2d 140)

Opinion filed May 9, 1964.

*George A. Robb*, of Newton, argued the cause and was on the briefs for the appellant.

*Kenneth G. Speir*, of Newton, argued the cause, and *Vernon A. Stroberg; Herbert H. Sizemore;* and *Richard F. Hydlicka,* all of Newton, were with him on the briefs for the appellees.

The opinion of the court was delivered by

PARKER, C. J.: This was an action in habeas corpus to determine the right to custody of an eight-year-old boy.

The pleadings reflect the respective positions of the parties and will be briefly noted.

Plaintiff, hereinafter referred to as petitioner, commenced the action by filing a petition, material allegations of which read:

"Comes Now Eleanor Miller Stafford and shows to the Court:

"That she is a resident of . . ., Hollywood, California.

"That she is the mother and natural guardian of David Alexander Miller, a minor, who was born on October 8, 1954.

"That Walton Goode and Eunice A. Goode, husband and wife, whose residence and address is Halstead, Harvey County, Kansas, are the parents of this petitioner, and, therefore, are the grandparents of said minor child, . . .

"That for several years David . . . has been and is now in the custody

and under the control of Walton Goode and Eunice A. Goode. That petitioner has demanded that Walton Goode and Eunice A. Goode surrender the custody of her said minor child to her, but that they have refused and still refuse to do so . . . *and in disregard of the demands of this petitioner, . . . unlawfully and forceably detain said minor child,* . . . *at their home.* . . .

. . . . . . . . . . . . . . .
"*That said restraint is illegal in that, as mother and natural guardian of said minor child, petitioner is entitled to the custody and control of said child,* and there is no judgment, order or decree of any court depriving petitioner of her natural and legal right of custody or awarding such custody to Walton Goode and Eunice A. Goode, either or both of them.

"Wherefore, petitioner prays that . . . an order be entered herein taking David Alexander Miller from the custody and control of Walton Goode and Eunice A. Goode and delivering him to the custody and control of this petitioner, . . ." (Emphasis supplied.)

In due time the defendants, Walton Goode and Eunice A. Goode, who will be referred to as respondents, filed their answer to the petition. Pertinent portions of that pleading read:

"These respondents admit that they have, and have had since infancy, the custody and control of David Alexander Miller by and with the consent and solicitation of the mother and father of said child. . . .

"That at all times since the birth of the said David . . ., these respondents, . . . have paid all bills and provided all of the maintenance of and for the said David . . ., and that neither parent has ever contributed or offered to contribute to the support, maintenance, and welfare of said child.

"*That . . . Eleanor Miller Stafford, the natural mother of the said David . . ., a minor, is not now and never has been and will not be a fit or proper person to have the care, custody, and control of the said David.* . . .

"*That these respondents, . . . allege and state . . . that the best interests of the said David . . . demand and require that these respondents, or some other suitable person, have the care, custody, and control of the said David.* . . .

"Wherefore, . . . respondents respectfully pray that the said Petition be denied, . . . and that these respondents be adjudged and decreed the care, custody, and control of the said David Alexander Miller, . . ." (Emphasis supplied.)

Petitioner's response to the foregoing answer was in the form of a general denial.

After joinder of issues as indicated the case came on for trial. Petitioner adduced her evidence. Respondents adduced their evidence. Petitioner then demurred to respondents' evidence on the ground it failed to prove any of the defenses alleged in the answer. This demurrer was overruled. Following this ruling petitioner did not see fit to offer any rebuttal evidence to refute

testimony offered by respondents, and admitted by the trial court, in support of their position petitioner was not a fit and proper person to have the care, custody and control of the involved minor because of an existing mental disorder.

At this stage of the proceeding it was agreed between court and counsel that counsel could submit law citations to the court and be heard in argument at a later date. On the date fixed counsel appeared and argued the cause. Following arguments the court announced its decision which, according to the trial court's journal entry of judgment, reads:

". . . the Court, having heard and considered the evidence and the arguments of counsel, having examined the exhibits and the files herein, and being fully advised in the premises, and having given full consideration and weight to the presumption in favor of the natural parent with respect to the custody of the said David Alexander Miller, finds that the petitioner, Eleanor Miller Stafford, the natural parent of the said David Alexander Miller, is not a fit person to have the care, custody, and control of her child, the said David Alexander Miller, and further finds that the respondents, Walton Goode and Eunice A. Goode, are fit, suitable, and proper persons to have the care, custody, and control of the said David Alexander Miller."

and then rendered judgment in accord with such decision.

After rendition of the judgment and the overruling of her motion for a new trial petitioner perfected the instant appeal wherein, under proper specifications of error, she is now entitled to appellate review of issues to which we shall presently refer.

The appellate questions involved will be simplified by further reference to the pleadings. It may be stated that an examination of the record discloses that unemphasized factual averments of both the petition and the answer, as quoted, are not in dispute; that all quoted allegations of the petition and the answer, both factual and in the nature of conclusions, which we have underlined for purposes of emphasis, are in controversy; and that the prayer of the respective pleadings discloses the position of each party on the conceded, as well as the controverted, facts. Thus it appears the case was tried in the court below wholly upon issues as to whether the petitioner, as the natural parent, was entitled to the custody of the child or whether the respondent grandparents were entitled to his custody because the petitioner was not then a fit or proper person to have his care, custody and control.

The record makes it clear that during the course of the trial the

lower court was fully cognizant of well-established rules of this court, to which we now refer.

See *Christlieb v. Christlieb,* 179 Kan. 408, 295 P. 2d 658, where it is said:

"It is a firmly-established rule in this state that a parent who is able to care for his children and desires to do so, and who has not been found to be an unfit person to have their custody in an action or proceeding where that question is in issue, is entitled to the custody of his children as against grandparents or others who have no permanent or legal right to their custody, even though at the time the natural parents seeks their custody such grandparents or others are giving the children proper and suitable care and have acquired an attachment for them. We cite but a few of our many decisions in support of the rule. (citing cases)." (p. 409.)

The numerous decisions cited in Christlieb, in support of the rule just quoted, are made a part of this opinion by reference.

See, also, *In re Vallimont,* 182 Kan. 334, 321 P. 2d 190, which holds:

"A parent who is able to care for his children and desires to do so, and who has not been found to be an unfit person to have their custody in an action or proceeding where that question is in issue, is entitled to custody as against grandparents or others who have no permanent or legal rights to custody." (Syl. ¶ 1.)

At the commencement of the trial petitioner testified as a witness in her own behalf and offered no further testimony. The trial court then caused the respondents to proceed with the introduction of their evidence. This procedure conforms with action approved by this court in *In re Vallimont,* supra, where it is said:

"At the close of the petitioner's evidence it was determined by the trial court, without objection by the parties, that the burden of proof then shifted from the petitioner to the respondents to show that the petitioner was an unfit person to have custody of his children." (p. 338.)

And held:

"Where a father makes an application for the custody of his children by a writ of habeas corpus, after the death of the children's mother who was awarded custody in a divorce from the father, and is resisted by the maternal grandparents on the ground that the father is unfit to have their custody, he will not be deprived of such custody unless the objection is sustained by clear and satisfactory proof." (Syl. ¶ 2.)

For decisions supporting the foregoing rule see *Jendell v. Dupree,* 108 Kan. 460, Syl. ¶ 1,195 Pac. 861; *In re Underwood, Petitioner,* 103 Kan. 505, 507, 175 Pac. 380, and *Pinney v. Sulzen,* 91 Kan. 407, Syl. ¶ 2, 137 Pac. 987.

In the face of an issue of unfitness, even though—as here—it must be conceded that the petitioner's evidence, standing alone, may be said to have established a *prima facie* right to the custody of the child, it does not follow that such right is an unconditional one. Long ago in *Pinney v. Sulzen,* supra, 412, a habeas corpus proceeding, this court said that courts do not hesitate to take a child from its parents and give it to a stranger if the parents are unfit to be entrusted with its custody and control by reason of their habits, character *or condition.*

More recently in *In re Vallimont,* supra, we said:

"While the standard of fitness required of parents is difficult to specify without being somewhat ambiguous, conduct which makes a parent unfit may be defined within limits. There is no statutory definition of the word 'unfit.' It therefore must be given its ordinary significance, having due regard to the context. In general the word means *unsuitable,* incompetent, or not adapted for a particular use or service. As applied to *the relation of rational parents* to their child, the word usually although not necessarily imports something of moral delinquency. Parents who treat the child with cruelty or inhumanity, or keep the child in vicious or disreputable surroundings, are said to be unfit. Parents who abandon the child, or neglect or refuse, when able so to do, to provide proper or necessary support and education required by law, or other care necessary for the child's well being are said to be unfit. *Violence of temper or inability or indisposition to control unparental traits of character or conduct, might constitute unfitness. So, also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit, apart from other moral defects."* (p. 340.) (Emphasis supplied.)

Thus we come to what must be regarded as the all-decisive factual question involved in this case, *i.e.,* the trial court's finding that the petitioner "is not a fit person to have the care, custody and control of her child."

The rule governing our decision of the factual question now before us which must, of course, be determined upon the basis of the evidence of record supporting it, is well stated in the case of *In re Estate of Guest,* 182 Kan. 760, 324 P. 2d 184, recently approved and reaffirmed in *In re Estate of Winters,* 192 Kan. 518, 523, 524, 389 P. 2d 818, where it is said:

". . . Time afer time, in fact, every month, this court is called upon to repeat the familiar rule of appellate review to the effect that where findings are attacked for insufficiency of the evidence this court's power begins and ends with a determination as to whether there is any competent substantial evidence to support them; that it has no power to judge the value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be

drawn therefrom, and that even though there is evidence to support a contrary finding, nevertheless, a finding based on competent substantial evidence will not be disturbed on appeal. For a thorough discussion of this proposition we call attention to what was said in *Bruington v. Wagoner*, 100 Kan. 439, 164 Pac. 1057." (p. 766.)

See, also, *Martin v. Hunter*, 179 Kan. 578, 297 P. 2d 153, and *State Farm Mutual Automobile Ins. Co. v. Cromwell*, 187 Kan. 573, 358 P. 2d 761, which hold that where it is claimed that the finding and judgment with respect to an all-decisive question, such as is here involved, are contrary to the evidence, it is only necessary on appeal to consider whether there is some competent and sufficient evidence upon which the finding and judgment is based; and a consideration or recital of the contradictory evidence cannot aid in correctly determining that question.

Reviewed in the light of the rule just stated the evidence adduced by the respondents, on which the trial court based its all-decisive finding as well as its judgment, may be said to consist of:

1. A record of the Halstead Hospital, identified as Exhibit A, and a record of the Hertzler Clinic, identified as Exhibit B, concerning treatment of the petitioner while a patient in both institutions. Boiled down these Exhibits disclose that, on April 25, 1955, at the request of her father, Walton Goode, petitioner was forcibly committed to the Hertzler Clinic for examination and treatment; that on May 2, 1955, a formal order of referral was entered by Judge Sam H. Sturm, then Probate Judge of Harvey County; that her condition was diagnosed as "sociapathic personality disturbance;" and that she was actually released by the hospital on August 15, 1955, approximately four months after the date she was committed, although she reported back a few times as an "out patient."

2. Testimony of William T. Wright, Jr., a clinical psychologist, whose qualifications as an expert are not challenged, who testified on direct examination that in 1955 he participated in the examination of, gave psychological tests to, and participated in conferences with the petitioner; that this was done at the Hertzler Clinic and at the Halstead Hospital, that he had not seen petitioner professionally since then until the date of the trial. This witness then stated that he had an opinion as to petitioner's condition in 1955 and when asked as to her condition at the time she was admitted to the hospital he stated that she was very upset and combative, and that psy-

chological tests were administered and a diagnosis of sociapathic personality disturbance was made.

With respect to the tests the witness on direct examination stated:

".  .  . She shows in the tests a lot of phantasies of a very hostile nature, particularly toward her father; also indications of impulses to harm herself and other people; some rather strong oppositional tendencies toward the mores and conventions of society. At this time she was—there was a tendency—Well, there was also a tendency for her to maneuver herself into situations where she would be abused and mistreated and then build up further resentments over this. She was very sensitive to the attitudes of other people—I would say hypersensitive to the attitudes other people had toward her; depended—I think I mentioned this. It may be redundant, but she depended very heavily on outward appearances; that is, a proper type of facade in order to get along with other people and to manipulate them. She is capable of being very—of erecting a facade which is very solicitous and show affection dramatically. Her acting ability, it shows through her as partly—a part of her personality as well as her training, no doubt. Beneath the surface of her rather dramatic ability to show what appeared to be love and affection and concern was a basic coldness underneath this—a lack of emotional depth. The techniques she used to get by in life consisted primarily of directly or indirectly manipulating people in her environment according to her own needs, also a heavy reliance upon phantasy life for gratifying her emotional needs. At times the tests suggested that this phantasy life was so vivid that it was difficult for her to tell the difference between what she was play-acting, or phantasy, and what was real or really felt. It showed that if these modes of handling her anxiety failed that she would tend to act out overtly her emotional conflicts and that this could take the form of a social or antisocial behavior."

Further testimony of the witness relating to the condition of the petitioner in 1955 reads:

"Q. —at that point could that overt action be destructive to herself—people or to somebody that she thought she loved or wanted to love? A. Well, in my opinion at the time these tests were run they could have been. Her controls over her impulses were very fragile.

"Q. The net result then, Doctor, of your examination and of your diagnosis is do you have an opinion as to whether or not she was a fit person to have the care, custody, and control of a child of tender years? A. At the time?

"The Witness: At the time these tests were run I would say definitely not.

"Q. Do you have an opinion as to whether or not she would inflict injury upon a child that was committed to her care and custody at that time? A. Physical injury or—

"Q. Yes. A. Yes, I think it would be possible.

"Q. And did those records and the other tests and other examinations tend to support or to not support your diagnosis?

"The Witness: The way this is handled is that we have a staff meeting with the psychiatrist making the diagnosis on the basis of his interviews with the patient and the psychologist on the basis of his psychological tests, and

there was an essential agreement between the diagnosis although—Let's see. The medical diagnosis was personality trait disturbance, impulsive personality. The psychological diagnosis was sociapathic personality disturbance."

Views of the witness, reflecting his expert opinion as to the petitioner's condition at the time of the trial from the standpoint of being fit or unfit to have custody of the child, appear from the following questions and answers:

"Q. What did you observe, Doctor, and did your observation tend to confirm your original diagnosis or to lead you to a different diagnosis? A. I saw much in common with the—I saw some things in common with the original diagnosis; however, I certainly wouldn't on the basis of just seeing her the short time here in the courtroom venture the same diagnosis again.

"Q. Doctor, did you see enough to lead you to the opinion that further diagnostic procedures were indicated to determine her fitness at this time? A. Yes.

"Q. Based upon his observations here does he have an opinion as to whether further diagnostic procedures are indicated?

"The Witness: In all fairness to both the parents and the mother, I certainly would.

"Q. From what you have observed here and your past diagnosis do you have an opinion as to whether further diagnostic procedures are indicated with respect to the welfare of the child, David Alexander Miller? A. I think it should."

### Cross-Examination

"Q. Now, your courtroom diagnosis, which I think you have been very frank with the Court about, Doctor, your observations there, I think you said that you wouldn't in any sense attempt to tell this Court that she had the same symptoms today that she had in 1955. Is that right? A. Not without further examination.

"Q. All right. And upon examination you might find that she had none, is that correct? A. There might be a—Yes, it is possible.

"Q. You might find that she had all of them, also? A. Had what?

"Q. That she had all the symptoms that she had in 1955. A. Yes."

### Recross-Examination

"The Court: Just a moment.

"Because of the nature of this proceeding, the Court wants to ask you a question or two. As I understand it, a sociapathic personality is one that is impulsive, shows poor judgment, and possibly will be on the fringe of difficulty. I am fishing for words here. Certainly while they have this type of personality they will be on the fringe of difficulty?

"The Witness: Yes.

"The Court: All right. There are different types of mental disturbances and I am wondering. Now, some respond to treatment quicker than others. What have you found on the sociapathic?

"The Witness: Sociapathic personalities have a very poor prognosis.

"The Court: In other words, one that had a sociapathic personality today,

it would take you considerable time to be effective in your treatment of that person?

"THE WITNESS: Yes, and there is a tendency for them not to stay in treatment.

"THE COURT: Now, maybe I am completely misusing my terms, but does a sociapathic suffer from a character disorder?

"THE WITNESS: Yes."

3. Testimony of Dr. John Edward Colburn Morton, a doctor of medicine, a member of the Royal College of Surgeons of England, and a certified specialist in psychiatry, whose qualifications as an expert are not challenged, reads in part as follows:

### Direct Examination

"Q. Doctor, based upon your examination of the records, both of the hospital and of the clinic, do you have an opinion with reasonable medical certainty as to the emotional and mental condition of the petitioner at the time reflected by the hospital and clinic records which is in the year 1955? A. Yes.

"Q. Doctor, do you feel that you can express an opinion based upon your examination of the records with reasonable psychiatric .certainty—I mean, with reasonable medical certainty as to her then condition as reflected by all the files and records? A. As reflected by the files and record, I feel that I can.

"Q. All right, what is your opinion? A. The evidence in this file points to the diagnosis of a sociapathic personality as being a justifiable diagnosis.

"Q. Doctor, would you explain to the Court just what you mean by sociapathic personality with particular reference to that person's capability to properly orient herself and to give proper care and attention to a child of tender years.

"THE WITNESS: The basic characteristic of these people is their tendency to be destructive in their behavior towards themselves and to others, although this is not always apparent. They tend to manipulate and use other people. They are interested primarily in their own satisfaction at the expense of others. I would say that it would be unfortunate for a child of tender years to be entrusted to the care of such a person.

"Q. Doctor, you have been present in this courthouse and in this courtroom since shortly before this proceeding began and you have had occasion to observe the petitioner and you saw her on the witness stand, heard her demeanor— heard her responses to questions asked and the demeanor she displayed during the court of that. Doctor, based upon your observations here today do you have an opinion with reasonable medical certainty as to whether or not the diagnosis that was made in 1955 is still at least probably valid today. A. Yes, I have.

"Q. What is your opinion. A. I see nothing inconsistent with that diagnosis and I would consider until it is disproved that it should stand.

"Q. Then, Doctor, do you have an opinion of such character that you may make a firm recommendation to the Court with respect to this petitioner and the welfare of this Child? Answer yes or no. A. Yes.

"Q. What is your opinion and what would be your recommendation?

"THE WITNESS: I would recommend that an independent clinical psychologist carry out a re-examination to confirm or disprove this diagnosis.

"Q. It is possible that over the years corrective action has occurred even though she has not had treatment? A. It is possible, but it is unlikely. This is one of the most difficult of psychiatric conditions to treat."

*Cross-Examination*

"Q. Doctor, what you are telling this Court is that eight years ago this girl was unable to take care of a teeny baby, is that correct, and that today she is still unable to take care of that same child? This is your opinion from reading the record? A. Yes.

"Q. Now, you said as far as you are concerned the diagnosis would stand until it was disproved, is that right? A. That is correct.

"Q. Doctor, your recommendation to the Court is on the basis that you believe that another look should be taken at her. You are not trying to tell this Court that you have formed an opinion that she is an unfit mother today, have you? A. I feel that the Court should in fairness to her give her a chance to prove that she has changed, but I would not expect her to change in view of the nature of the diagnosis that was made eight years ago.

"Q. You wouldn't expect her to change in eight years? A. No.

"Q. The fact that she is taking care of children today and doing a capable job of it wouldn't change your opinion? A. No, it wouldn't."

Where the question is whether a person is afflicted with a particular form of mental disorder, which can be concealed from the laymen by a personality facade, medical testimony presents the most clear and satisfactory evidence.

The medical evidence was substantial and competent in character. The petitioner did not attempt to rebut it. It was sufficient to raise a disputed question of fact, which was the function of the trial court, not this court of appeal, to determine.

The petitioner objects to that part of the trial court's judgment which restrained and enjoined her from removing or attempting to remove the child from the care and custody of the respondents. We cannot say that under the facts and circumstances as disclosed by the record that the trial court was not justified in issuing such restraining order against the nonresident petitioner as it felt was necessary to protect its custody order. However, we point out that nothing in the trial court's judgment, or what is here said and held, should be construed as precluding or enjoining the petitioner from bringing an action in the future to obtain custody of the child on the basis of petitioner's changed or improved mental condition.

In conclusion it may be stated that an extended review of the

record and careful consideration of all contentions raised by petitioner on appeal disclose no trial errors which would justify a reversal of the judgment.

The judgment is affirmed.

ROBB, J., dissenting.