No. 45,136

Inez M. King, Guardian of Helena M. Robbins, *Appellant,* v. Harry Neal Robbins and Agness Robbins, also known as Aggness Robbins, his wife, *Appellees.*

(443 P. 2d 308)

Opinion filed July 13, 1968.

Robert H. Nelson, of Wichita, argued the cause, and W. A. Kahrs, H. W. Fanning, Richard C. Hite, Darrell D. Kellogg, Roger Sherwood and Richard L. Honeyman, all of Wichita, were with him on the briefs for the appellant.

G. Leroy Warner, of Wichita, argued the cause, and Robert F. Bailey, Laurence S. Holmes, T. L. O'Hara and Willis W. Wall, all of Wichita, were with him on the briefs for the appellees.

The opinion of the court was delivered by

Kaul, J.: This is an action to recover the fee title of future interest in real property. The subject property was conveyed to defendant, Harry Neal Robbins, by his mother, Helena M. Robbins, who reserved a life estate. The conveyance was effected by the execution of two deeds by Helena M. Robbins on March 3, 1953.

This is a second appeal by plaintiff-appellant. An order of the trial court sustaining a demurrer to the amended petition was reversed by this court in the first appeal, wherein it was held the petition stated a cause of action for the recovery of real property to which the 15 year statute of limitations applies.

The amended petition is reproduced in its entirety in *King v. Robbins,* 193 Kan. 70, 392 P. 2d 154, and is incorporated by reference herein.

Plaintiff-appellant, Inez King, is a cousin and daughter by adoption, as well as guardian, of Helena M. Robbins. Defendant-appellee, Harry Neal Robbins, usually called, Neal, is the son of Helena. Agness Robbins is the wife of Neal. We are informed that Helena died on December 25, 1967, at the age of eighty-nine.

For convenience, the parties will be referred to hereafter by their first names or as plaintiff and defendants.

The action is based on an alleged oral contract by the terms of which plaintiff claims Neal agreed to reconvey the subject real property to his mother, Helena, provided she file a divorce action against her husband, and dismiss three actions pending against Neal.

Defendants denied the existence of any such oral contract and alleged the three actions were dismissed by Helena in compliance with the provisions of a written contract, executed by Helena and Neal on March 3, 1954, entitled "Settlement of Litigation and Real and Personal Property Accord and Satisfaction," referred to hereafter as the accord and satisfaction agreement.

Defendants further alleged that Helena, by various acts, acquiesced in, ratified, and acknowledged Neal's interest in the real property and that said acts were contrary to the provisions of the alleged oral agreement.

Following the mandate in the first appeal, the case was tried to the court which made comprehensive findings of fact, conclusions of law and entered judgment for defendants.

Essentially, plaintiff claims on appeal that the evidence does not support the findings of the trial court. Specifically it is contended:

"1. The court erred in failing to find that an oral agreement had been entered into by and between the defendant, Harry Neal Robbins, and the plaintiff, and that the plaintiff had complied with the agreement in all respects.

"2. The court erred in failing to find that the signature of Helena M. Robbins to the Accord and Satisfaction Agreement was a forgery and not the signature of Helena M. Robbins."

Evidence pertinent to our disposition of the matter may be summarized.

Helena was the widow of Henry Robbins, who died testate in 1944. By will all of his property was bequeathed and devised to Helena. Henry's will was drawn by Ray H. Tinder, an attorney of the Wichita bar, who was employed by Helena to represent her as executrix. Mr. Tinder continued to represent Helena in numerous business matters and at the time of trial had accumulated thirty files concerning her affairs.

In March of 1953 Helena, who was then seventy-five years of age, accompanied by Bob Stover, a young man in his twenties, called on Tinder at his law office. Helena informed Tinder that she intended to marry Stover. A few days later Helena returned to Tinder's office and asked what she could do to protect the interest of her son Neal in her property. A conversation was had in which Helena's property, consisting of real estate, oil money, stocks, bonds, cash and a substantial annual income, was discussed. Tinder advised Helena that she could deed the farms to Neal and reserve a life estate for herself, which would give her the income for life and upon her death the farms would belong to Neal. Subsequently, the deeds in question were prepared and executed. Neal was unaware of the deeds until after their execution.

Helena and Bob Stover were married on March 5, 1953. Neither Inez nor Neal was in touch with Helena thereafter until November 22, 1953. In the meantime, Helena and her husband Stover returned to Wichita and retained an attorney, Robert Blase, to file an action to recover the property deeded to Neal. Sometime during this interim, Helena suffered a stroke which resulted in some paralysis.

Agness learned of Helena's address in Tulsa, Oklahoma, and telephoned a mutual friend, Mrs. Regina Anderson in Tulsa. On the same day Mrs. Anderson drove Helena to Wichita where they joined Neal and Agness. Helena was taken to the Starlight Motor Lodge in Wichita. Helena informed Neal that she wanted to see Mr. Tinder who was called to the motor lodge. The dispute as to what took place thereafter at the lodge, during the evening of November 22, 1953, is the crux of this controversy.

Tinder, whose testimony concerning the conversations at the lodge is essentially the same as that of Neal, testified that he arrived at the lodge about 7 p. m. Helena was reclining in bed, Neal, Agness, Dr. Scuka, and Mrs. Tinder were present.

Tinder's testimony is further narrated as follows:

"The minute I came in Mrs. Robbins said: 'Tinder, I want a divorce.' She said nothing about the deeds to the property. I told her that a divorce was one thing, but there were other matters for consideration and that with the doctor's permission I would see her the following day and discuss the matters. Inez King arrived about fifteen minutes after I arrived. There was no conversation between Inez and Helena pertaining to business, just pleasantries. There likewise was no conversation between Inez and Neal in my presence. The Kings left first and I left about ten or fifteen minutes after they did. Mr. and Mrs. Neal Robbins were there when I left but I don't remember whether

the doctor left before me or after me. There was no conversation in my presence about any sort of an oral contract where Neal Robbins was to reconvey property to Helena. I next saw Helena Robbins the following day."

In her version of the meeting at the lodge, Inez did not include the presence of Dr. Scuka or Mr. and Mrs. Tinder. Inez testified that her sister, Mrs. Grace Akers, and her husband, Neal and his wife, Agness, and Helena were present, and

"Neal said that everything was going to be alright. He says, 'We have told mom that if she will divorce Bob, and dismiss the suits that are against us, we will give her the farms back and make everything all right. We will get this thing straightened out.'

"Q. What did Mrs. Robbins say to do?

"A. Well Mrs.—well, she was real pleased over it, but she couldn't say too much, because at that time her vocal cords were impaired from the stroke.

"Q. Did she indicate in any way . . . (interrupted)

"A. Yes, she indicated that was all right.

"Q. (Continuing) . . . that she wanted that?

"A. That that was what she wanted."

Helena was taken to St. Joseph Hospital the next day, November 23, 1953. Tinder testified he saw Helena in the hospital the next day, that she told him she wanted to dismiss the suits against Neal, retain her life estate, and that he was to proceed with a divorce. Inez disputes this, claiming that Helena remained in the motor lodge the next day and that Tinder saw her there.

Tinder saw Helena at the hospital again on November 24, when she directed him to prepare a will. Tinder prepared the will and returned to the hospital on November 28, when Helena signed the will before two witnesses.

Helena was granted a divorce from Stover in January of 1954. The journal entry recited that Helena had her life estate set aside to her.

After the divorce was granted, Helena and Neal, on the advice of Tinder, entered into an accord and satisfaction agreement on March 3, 1954. Helena signed the agreement in the presence of Neal and Tinder, who testified that she used her right hand guided by her left hand.

In the text of the agreement it was stated that Helena and Neal recognized that the harmonious relationship, previously existing between them as mother and son for a period of fifty years, had been disturbed and interrupted by Helena's marriage to Bob Stover. That since the divorce and restoration of her former name, Helena

and her son have terminated all misunderstandings which had existed and have perfected a settlement, accord and satisfaction of all such misunderstandings. By the terms of the agreement, Ray H. Tinder was employed by mother and son, as their agent and attorney, to dismiss the three actions filed by Helena Robbins Stover against Neal, described as the Haysville Elevator case, the Real Property case and the Safety Deposit Box case. By the terms of the agreement, Tinder was also authorized to pay federal income taxes and debts owed by Helena to persons in Tulsa, Oklahoma, and to pay $1,000 to Inez King out of funds placed in his possession by Helena and Neal.

On March 4, 1954, the actions pending against Neal were dismissed with prejudice. On the same day, Tinder delivered a check for $1,000 to Inez, as provided for in the agreement. Tinder testified that Inez first declined the check saying "I don't want that. I am going to have more." However, she accepted the check and cashed it.

Subsequently, during the latter part of March 1954, Inez came to Tinder's law office and suggested that she be adopted by Helena. As reflected in the record Tinder replied: "Inez, you are a grandmother. Helena Robbins is a grandmother. I don't believe you should do that. It might become too obvious." Tinder told Inez there was quite a lot of property involved and that he did not want to do it. At this point Inez left Tinder's office. On March 24, 1954, Helena adopted Inez.

During the period from March 1954 to April 1962 defendants contend Helena acknowledged the rights of the parties in the subject property on several occasions.

On June 18, 1955, Neal, Agness and Helena executed an oil and gas lease, which contained the recital:

"Royalty payments, during life estate, to be paid as follows:
"Helena M. Robbins, two-thirds; Harry Neal Robbins one-third."

On February 8, 1956, in a condemnation action involving a part of the subject real estate, a stipulation was filed reciting in part:

". . . the life tenant, Helena M. Robbins and the remainderman, Harry Neal Robbins. That it is stipulated by and between the said life tenant and the remainderman herein that an order be made directing the clerk to distribute the funds in the following proportions:
"Helena M. Robbins, one-third
"Harry Neal Robbins, two-thirds;"

On November 24, 1961, Helena was found to be mentally incompetent and Inez was appointed her guardian. This lawsuit was filed six months later, on April 19, 1962.

As we have indicated, plaintiff first contends the trial court erred in failing to find the existence of the oral agreement between Helena and Neal, as alleged by plaintiff. Plaintiff concedes there was conflicting testimony with regard to the alleged oral agreement. Her argument in support of her claim of error is based on the failure of Agness, wife of Neal, to testify. Plaintiff states in her brief:

". . . the court failed to take into consideration the presumption that the defendent Agness Robbins could not testify in her own behalf and it would, therefore, be presumed that she would not corroborate the testimony of her husband."

In her attack on the judgment on this point plaintiff relies on the presumption or inference that the failure of a party to produce a witness, presumably favorably disposed toward him, to explain a transaction or controversy, that such evidence if produced would be unfavorable to the party failing to produce it. Plaintiff cites the cases of *Blackburn v. Colvin*, 191 Kan. 239, 380 P. 2d 432; *Henks v. Panning*, 175 Kan. 424, 264 P. 2d 483; *Donley v. Amerada Petroleum Corp.*, 152 Kan. 518, 106 P. 2d 652, and *Trust Co. v. Allen*, 110 Kan. 484, 204 Pac. 747, in which this court has acknowledged the presumption advanced by plaintiff. While the presumption was applicable to the facts and circumstances in the cases cited by plaintiff, such is not the case with respect to the case at bar.

A careful examination of the cases cited by plaintiff reveals that the presumption or inference of fact, as it is more accurately defined in *Trust Co. v. Allen*, supra, cannot be drawn from the circumstances presented by the record here.

In the instant case plaintiff claims the oral contract to reconvey the subject property was entered into at the motor lodge during the evening of November 22, 1953. Both Neal and Tinder related in detail their versions of the events of that occasion and specifically denied the existence of any such oral agreement. Tinder testified specifically that Inez and her husband arrived after he was there and left before he did. In view of the testimony of Neal and Tinder concerning the facts, the failure to call Agness does not give rise to an inference that, if called, her testimony would have been unfavorable to defendants.

In the cases cited by plaintiff there was either a complete failure to throw any light upon an issue peculiarly within the knowledge of a party or not equally accessible to his opponent, or where there was an indication of deliberate withholding or concealment of knowledge. There is no suggestion of concealment or withholding here. In this jurisdiction the inference has never been drawn where the testimony of the witness, who was not called, would have amounted to only cumulative or corroborative evidence of facts already testified to by other qualified witnesses.

With reference to the drawing of an inference from circumstances, such as exist here, the rule is stated in 29 Am. Jur. 2d, Evidence, § 186:

"Most of the courts considering the matter have taken the view that the failure of a party to call a witness to prove facts does not give rise to an inference that the testimony of the witness, if he had been called, would have been unfavorable to such party, where other qualified witnesses have testified for the party concerning such facts, or such facts have been admitted by the pleadings of the opposite party, so that the testimony of the uncalled witness would have been merely cumulative or corroborative. Under this rule, a party is not bound to introduce every witness who might know anything about the matter at issue, at the risk of being burdened with an unfavorable inference because of his failure to do so. . . ." (pp. 234, 235.)

See, also, 1 Jones Commentaries on Evidence (2nd Ed.) § 102, pp. 175, 176, and 2 Wigmore on Evidence (3rd Ed.) §§ 287, 288, pp. 168, 169.

For her second point on appeal, plaintiff claims the trial court erred in failing to find that Helena's signature to the accord and satisfaction agreement was a forgery.

Qualified handwriting experts testified for both parties. Their testimony was in sharp conflict. The testimony of defendants' expert was corroborated by Tinder and Neal, who testified they saw Helena sign the instrument and described her difficulty in so doing. The burden of proof was on plaintiff and the trial court found her evidence insufficient to support the burden.

Here again, as in her argument on her first point, the plaintiff is actually asking that we reweigh the evidence. We have repeatedly said that it is not the function of an appellate court to weigh conflicting evidence on appeal. A recent pronouncement, citing many of our cases in which the rule is stated, may be found in *Griffin v. Price*, 199 Kan. 649, 433 P. 2d 464.

. . There is an abundance of competent substantial evidence to support the trial court's findings which in turn support the judgment rendered.

It is further to be noted that in this appeal we are called upon to set aside a negative, rather than an affirmative, finding of fact, *i. e.*, the failure to find the existence of an oral contract. In our law governing the review of factual issues presented on appeal there is a wide difference in the status of an affirmative finding of fact and a negative finding which usually requires an appellate court's nullification of a trial court's disbelief of evidence.

Plaintiff's evidence concerning the alleged oral contract to reconvey consisted mainly of the testimony of Inez. Her testimony was self-serving and essentially uncorroborated. An appellate court will not set aside a negative finding of fact by nullifying a trial court's disbelief of evidence if such evidence is limited in quantity or its weight and credibility questionable, or if the evidence may be disregarded for any reason. (*In re Estate of Shirk*, 194 Kan. 424, 399 P. 2d 850; *In re Estate of Curtis*, 193 Kan. 431, 394 P. 2d 59; *In re Stafford*, 193 Kan. 120, 392 P. 2d 140; *In re Estate of Winters*, 192 Kan. 518, 389 P. 2d 818; *In re Estate of Johnson*, 155 Kan. 437, 125 P. 2d 352, and *Kallail v. Solomon*, 146 Kan. 599, 72 P. 2d 966.)

The conclusion of the trial court that plaintiff has failed to sustain the burden of proof in establishing an oral contract between Helena and Neal, as alleged by plaintiff, cannot be overturned.

The judgment is affirmed.